IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| DR. ANILA DAULATZAI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:21-cv-00590-JKB |
| | ) | |
| STATE OF MARYLAND | ) | |
| | ) | |
| And | ) | |
| | ) | |
| SOUTHWEST AIRLINES CO., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## SECOND AMENDED COMPLAINT AND ELECTION FOR JURY TRIAL

Plaintiff Anila Daulatzai ("Dr. Daulatzai"), by and through her undersigned attorneys, hereby files this Complaint against Defendants Southwest Airlines Co. ("Southwest" or "Southwest Airlines") and the State of Maryland, and in support thereof states and alleges as follows:

**NATURE OF THIS ACTION**

1.     Dr. Daulatzai brings this action to recover damages for injuries she sustained as a result of her racially discriminatory and wholly unjustified forcible removal from a Southwest Airlines flight departing from Baltimore Washington International Thurgood Marshall Airport ("BWI Airport") on September 26, 2017 on the basis of her race and in violation of federal and state law.

**PARTIES**

2.     Plaintiff Anila Daulatzai is a resident of Baltimore City, Maryland.

3.     Defendant Southwest Airlines carries on regular business as an airline carrying passengers from BWI Airport in Anne Arundel County to various locations throughout the United States.

4.     Defendant the State of Maryland employs as its agents, servants, and employees Police Officers of the Maryland Transportation Authority who are stationed at BWI Airport.   Included among the Maryland Transportation Authority Police Officers stationed at BWI Airport on or about September 26, 2017 were Officer D. McLhinney (#1694), Corporal R. Alston (#0836), Corporal R. Mossman (#1055), Officer L. Myers (#1714), and Senior Officer J. Karpiak (#0505).  At all relevant times described herein, the MTA Police Officers identified were acting both individually and within the scope of their

employment as agents, servants, and employees of the State of Maryland.

## FACTS COMMON TO ALL COUNTS

5.      Dr. Anila Daulatzai is a socio-cultural anthropologist, born to immigrant parents from Pakistan. She has served at various institutions as a professor of Gender Studies, Islamic Studies, and Anthropology. She earned graduate degrees in public health and Islamic studies from UCLA and obtained her master's and her PhD in Anthropology from The Johns Hopkins University.  Dr. Daulatzai has taught and held academic positions at The Johns Hopkins University, Harvard University, and Brown University in the United States. She has also taught and held academic positions in several prestigious international universities. At the time of the incident, in September 2017, Dr. Daulatzai was employed as an Assistant Professor in the Department of Humanistic Studies at the Maryland Institute College of Art in Baltimore, Maryland. She is currently the distinguished Chancellor's Fellow at the University of California, Berkeley, in the Department of Anthropology.

6.      Dr. Daulatzai is non-white and has brown skin.  While phenotypically, it may be difficult to place Dr. Daulatzai's ancestral origins, she clearly presents and is perceived as non-white. She has experienced and been subject to racism and discrimination her entire life.

7.      On September 26, 2017, Dr. Daulatzai was a fare paying passenger on Southwest Airlines Flight 1525 departing from BWI Airport to Los Angeles, California.

8.      Dr. Daulatzi was then the primary caretaker of her elderly father and the purpose of her trip was to attend a meeting with several physicians the following morning to discuss his treatment plan and prognosis.  The meeting required getting a number of specialists together in one room at the same time and had been pre-arranged months earlier.

3

9.      At that time, Dr. Daulatzai had regularly flown back and forth between BWI and Los Angeles up to two to three times per week using Southwest Airlines Co. to get to LA to help take care of her ailing father.

10.      On several of those flights, there were dogs on board.  Thus, Southwest possessed the institutional knowledge that Dr. Daulatzai flew with the airline numerous times with dogs on board without incident.

11.      Prior to boarding the aircraft while in the waiting area, Dr. Daulatzi observed several dogs running around.

12.      Dr. Daulatzi has an allergy to dogs that, at its most extreme, causes itchy eyes and a runny nose.

13.      Upon boarding, Dr. Daulatzai asked the Southwest agent checking in passengers how many dogs were going to be on the flight to Los Angeles.  She was informed that only one dog was on the aircraft and it was with a passenger seated at the front of the plane.

14.      Dr. Daulatzi took a seat near the rear of the aircraft and began to grade papers while she waited for the aircraft's departure.

15.      Shortly thereafter, a flight attendant approached Dr. Daulatzai and asked her if she was the person who had the dog allergy.  Dr. Daulatzai responded that she has a dog allergy, but it is not a life-threatening one. The attendant explained that the reason they came over was to alert her that there would be not one, but two dogs on board the plane. Dr. Daulatzai then asked where the second dog was and, after the flight attendant advised her that it was with a passenger seated near the front of the aircraft as well, Dr. Daulatzai responded that having a second dog on the plane was not an issue for her.

16.      A few moments later, a second flight attendant approached and told Dr.

4

Daulatzai that, in the event that she needed an EpiPen, there was one on board the plane. Dr. Daulatzi thanked the flight attended and reiterated that her allergy was not that severe and shared that she had never needed to use an EpiPen before. Shortly thereafter, other airline personnel approached and questioned Dr. Daulatzi about her dog allergy and each time she reiterated that her allergy was not life-threatening.

17. Sometime later, an older gentleman, who Dr. Daulatzai subsequently learned was an MTA Police Officer, approached Dr. Daulatzi and asked her if she had a food allergy. Dr. Daulatzai responded that she did not and that there must be a misunderstanding. The older MTA Police Officer then insisted that Dr. Daulatzai did have a food allergy. He continued to insist that she had a food allergy and began asking her to identify the specific foods she was allergic to and everything she had eaten that day. Dr. Daulatzai reiterated that she did not have a food allergy and that there must be some misunderstanding, or miscommunication. Dr. Daulatzai also confirmed that she had mentioned having a non- life-threatening dog allergy but had no food allergy. The older MTA Police Officer then insisted that several people had informed him that Dr. Daulatzai had food allergies and said that he had been called to discuss her food allergies. Dr. Daulatzai then requested to speak to whoever told him she had food allergies so she could clarify the nature of her allergies and resolve the misunderstanding.

18. The older MTA Police Officer returned accompanied by Captain Darren Medeiros (the "Captain"). The first words out of the Captain's mouth were, "I do not feel comfortable with you on this plane."

19. Dr. Daulatzai again replied that she did not have a food allergy and reiterated that her dog allergy would not be an issue since she was seated at the rear of the aircraft and the two dogs were located with passengers at the front of the plane. She asked the Captain what she could do to make him comfortable and explained that she was her sick father's primary

caretaker and needed to be in Los Angeles the following morning.  She also reiterated that there had clearly been some kind of miscommunication since she did not have any food allergy and her dog allergies are not life-threatening.  The Captain acknowledged that she did not have a food allergy but maintained that she had a life-threatening dog allergy.  Dr. Daulatzai advised the Captain that she had informed every Southwest employee she talked to that her dog allergy was not life-threatening and  asked him to identify the flight attendants who claimed she said otherwise so they could clear up the confusion, but the Captain  flatly refused and continued to assert without any further explanation that he did not feel comfortable with her on the plane.

20.    Notwithstanding the fact that Dr. Daulatzai did  not have a life-threatening food allergy or dog allergy, the Captain summoned additional MTA Police Officers to the aircraft and requested for Dr. Daulatzai to be removed from the plane.

21.    Thereafter, at the insistence of the Captain and other airline personnel, additional MTA Police Officers came aboard the aircraft and forcibly removed Dr. Daulatzai from the  plane without her consent and without probable cause to believe that she had committed a crime.

22.    Specifically, shortly after the older MTA Police Officer and the Captain walked away, two more MTA Police Officers approached Dr. Daulatzai as she was grading papers. One of them observed that she looked like "some sort of teacher," and said that she was "going to learn a lesson today."  Then both MTA Police Officers began lifting Dr. Daulatzai out of her seat by her belt loops.

23.    At the time of Dr. Daulatzai's forcible removal from the aircraft by these two MTA Police Officers, she was pregnant with her first child and understandably concerned about her health and that of her unborn child.  She immediately informed them that she was

pregnant and would walk off the aircraft by herself.

24.    The two MTA Police Officers continued to pull Dr. Daulatzai out of her seat by the belt loops of her pants, ripping her pants, and leaving her thighs and crotch exposed.

25.    Dr. Daulatzai again told the two MTA Police Officers that she was pregnant. She asked them not to touch her and told them she would walk off the plane herself.

26.    Notwithstanding her pleas, the two MTA Police Officers physically grabbed and dragged/pushed Dr. Daulatzai from the plane.

27.    Upon exiting the aircraft and reentering the terminal, the Police Officers "high fived" each other.

28.    Following Dr. Daulatzai's removal from the aircraft, she was placed in a holding area for several hours and her multiple and repeated requests to call her husband, a friend, or an attorney were refused.  She also was not permitted to go to the restroom despite multiple requests to do so.

29.    Initially, Dr. Daulatzai was told she was being held for questioning.

30.    Ultimately, Dr. Daulatzai was placed under arrest without a warrant and charged with numerous offenses, including disturbing the peace, resisting arrest, obstruction, and failure to obey a lawful order, based on information known to be false.

31.    She was taken to the police station, where she was booked, fingerprinted, photographed and then released on her own recognizance to appear for trial on the above-mentioned charges.  She was not released until the morning of September 27, 2017.

32.     As a result of the improper, unlawful, and forceful removal of Dr. Daulatzai from the aircraft, she sustained physical injuries to her shoulders, wrists, neck and back and severe and concerning emotional injuries, including grave concern for her pregnancy.

33.     Video of Dr. Daulatzai's removal was captured and went viral.

34.     While passengers were documenting the disturbing and obviously racist removal of Dr. Daulatzai with their cell phone cameras, Southwest airlines personnel pleaded with passengers to "please, please, put [their] phones away."   In addition to these pleas to not record, over the plane's intercom system an announcement was made that anybody recording is breaking the law and would be removed and charged with an offense. Such an action would not be necessary if the removal were for legitimate, non-discriminatory, safety reasons as Southwest Airlines regularly allows cell phone video to be captured on its flights.

35.     After the incident, Southwest put out public statements regarding the incident. First, they stated, "We are disheartened by the way this situation unfolded and the customers removal by local law enforcement officers. We publicly offer our apologies to this customer for her experience and we will be contacting her directly to address her concerns."  Later, in an about face, Southwest stated, "Our reports indicate the customer stated that she had a life threatening pet allergy but she was unable to provide the medical certificate necessary to complete travel."  This second statement was a falsehood knowingly and maliciously told as Southwest's own internal documents reveal that the Captain acknowledged that Dr. Daulatzai told him that she does not have a life-threatening pet allergy and that she had always asserted that she never told anyone that she had a life-threatening pet allergy.

36.     Such a deviation in a public statement from the Captain's own account would not have been necessary if Dr. Daulatzai's removal was for a legitimate, non-discriminatory, safety reason.

8

37.     As a result of Southwest's false and misleading public statements, for nearly a year Dr. Daulatzai received hate mail, including death threats, from people triggered by the airline's false narrative that she had a problem with dogs.

**COUNT I**
**(Discrimination in the Making and Enforcement of Contracts in Violation of 42 U.S.C.**
**§ 1981, as amended by the Civil Rights Act of 1991, Against Southwest Airlines)**

38.     Plaintiff repeats and realleges the facts and particulars set forth in paragraphs 1 through 37 and incorporates them here.

39.     The Southwest employees' repeated assertion that Dr. Daulatzai stated that she was deathly allergic to dogs was a lie — made up out of whole cloth.

40.     The written statements of the Southwest employees reveal that Dr. Daulatzai was flagged as suspicious by Southwest personnel before boarding and her behavior was deemed "odd" simply because she misplaced her boarding pass.

41.     Southwest's business records reveal that shortly after this interaction, the flight attendants on Dr. Daulatzai's flight approached the pilot and demanded that he order Dr. Daulatzai off the plane.  In fact, internal Southwest documents reveal that the flight attendants threatened the Captainitan with an unauthorized, unlawful, wildcat strike, if he did not order Dr. Daulatzai removed.  Specifically, the documents state that the flight attendants told the Captainitan that if Dr. Daulatzai was not deboarded, they would not fly.  Such an extreme position would not have been necessary if Dr. Daulatzai's removal were for legitimate, non-discriminatory, safety reasons.

42.     Internal Southwest documents reveal that the Captain recognized that Dr. Daulatzai maintained that her dog allergy was not life-threatening and that she never said such to any flight attendant.  As such, her mild dog allergy could not form the basis of a legitimate, non-discriminatory, safety reason for her removal.

9

43.   Not only did the Captain cave to the racist demands of his flight crew and direct the flight's ground crew to summon law enforcement to forcibly remove Dr. Daulatzai from the plane,  when he spoke to Dr. Daulatzai, he spoke down to her in an aggressive and abusive tone.  Such a manner of speaking would not have been necessary if the Captain was seeking to remove a passenger for legitimate, non-discriminatory, safety reasons.  Dr. Daulatzai, always maintained a gentile, cordial tone until she was violently assaulted, battered, and verbally abused by police officers.

44.   Internal Southwest documents reveal that after takeoff, the Captain demanded that each flight attendant meet with him individually in the cockpit "to discuss the matter." These meetings occurred before any flight attendant wrote a statement.  Engaging in such a conspiracy would not have been neccessary had Dr. Daulatzai been removed for legitimate, non-discriminatory safety reasons.

45.   The pilot, flight crew, gate agents, and ground personnel for Southwest Airlines flight 1525 on September 26, 2017, at all relevant times, were agents and/or employees of Defendant Southwest Airlines.

46.   Defendant Southwest Airlines is liable for the unlawful acts of its agents and employees directly and under the doctrine of respondeat superior.

47.   Defendant Southwest Airlines engaged in intentional discrimination on the basis of Dr. Daulatzai's perceived race, ancestry, or ethnicity by having Dr. Daulatzai forcibly removed from flight 1525 on September 26, 2017 and, in doing so, Defendant Southwest Airlines discriminated against Dr. Daulatzai in the making and enforcement of her contract to fly on Southwest Airlines flight 1525 on September 26, 2017.

48.   The actions of Southwest's personnel as described above are right in line with stereotypical and racist tropes based on the assumption that all brown-skinned Middle

10

Eastern or South Asian air travelers are inherently suspicious.

49.    Their actions are also in keeping with Southwest's troubling and well-documented history of engaging in a pattern or practice of racially profiling and discriminating against people of color, particularly those of Middle Eastern and/or South Asian descent.

50.    For example, in November of 2015 two Middle Eastern men were denied boarding by Southwest at Chicago's Midway airport after another passenger complained to the airline's staff that the men were speaking Arabic. Southwest agreed with the bigoted passenger that merely speaking Arabic is a safety concern and a basis to deny boarding. The police were involved and the men were eventually let on board.

51.    That same week — in the same airport — six men of Middle Eastern descent, who were traveling together, were removed from a Southwest flight for asking passengers if they would be willing to switch seats so the group could sit together (Southwest has a policy of unassigned seating). The Southwest flight crew removed the gentlemen from the flight. In a statement regarding this incident, Southwest said, "Safety is our primary focus and our employees are trained to make decisions…"

52.    In April of 2016, in another flight out of Chicago, a Muslim woman of Somali descent was kicked off a Southwest flight for asking the man next to her if he would switch seats. After the man agreed, a Southwest flight attendant told the passenger to disembark. When police asked the flight attendant at the gate if there was any reason why the passenger had been taken off the plane, the flight attendant replied "No" and that she did "not feel comfortable" with the passenger. In a public statement, Southwest brazenly ratified the flight attendant's conduct by stating, "Information available, collected at the time of the event, indicates that our employees followed proper procedures in response to

this customer's actions while onboard the aircraft. Out of respect for the customer's privacy, we will not share specifics about her conduct or travel experience."

53. In another Southwest flight from Los Angeles to Oakland in April of 2016, a University of California Berkley student of Middle Eastern descent was removed from a flight because a racist passenger felt "uncomfortable" with him speaking in Arabic on the phone. Southwest chose to placate the racist and removed the young man from the flight. In an effort to justify their removal of this young man, a Southwest employee made up an excuse — out of whole cloth — and claimed that the young passenger was speaking about martyrdom in Arabic. The Southwest employee repeated this lie to the FBI. The FBI did not find the statement credible and released the young man that same day and he immediately boarded another flight from another carrier. In a statement Southwest simply stated, "We regret any less than positive experience a customer has onboard our aircraft."

54. In November of 2019, on a flight from Houston to DC, a Southwest flight attendant called the ground crew to remove a woman of Middle Eastern descent from a flight for wanting to sit next to her husband and children. When the woman asked a fellow passenger if he was willing to switch seats with her, the flight attendant told the woman that she was going to be "escorted off the plane" for making people feel "uncomfortable." The flight attendant then proceeded to call the ground crew to order this woman be thrown off the flight. The ground crew member refused to remove the woman. In a statement, Southwest stated "From our initial discussions, we understand that some passengers on Flight 5539 were involved in a disagreement over seat selection near the end of boarding." An eyewitness refuted the claim that there was a disagreement among passengers and that the disagreement was limited to the flight attendant.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her

12

favor declaring that the actions of Defendant Southwest Airlines described above constitute unlawful discrimination on the basis of race, ancestry, ethnicity, or color in violation of 42 U.S.C. § 1981; permanently enjoining Defendant Southwest Airlines and its agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described above, including discontinuing the custom or policy granting unfettered discretion to employees to remove passengers from airplanes based on race, and to prevent similar occurrences in the future; and awarding Plaintiff damages against Defendant Southwest Airlines in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars), including compensatory damages in an amount to be determined at trial for her losses and injuries, including, but not limited to, humiliation, embarrassment, emotional distress, deprivation of her right to enter into and enforce contracts regardless of her race, ancestry, or ethnicity, punitive damages in an amount to be determined at trial to punish Defendant Southwest Airlines for its willful, wanton, and reckless conduct and to deter such conduct in the future, plus Plaintiff's expenses, costs, and fees associated with the filing of this action, including reasonable attorney's fees, prejudgment interest, and such other and further relief as the Court deems just and proper.

### COUNT II
### (Malicious Prosecution Against All Defendants)

55. Plaintiff repeats and realleges the facts and particulars set forth in paragraphs 1 through 54 and incorporates them here.

56. Both Defendant Southwest Airlines and Defendant the State of Maryland, by and through their agents, servants, and employees, maliciously and without probable cause requested that Plaintiff be arrested and charged with crimes, including disturbing the peace, resisting arrest, obstruction, and failure to obey a lawful order, based on information known

13

to be false.

57.   These charges were nolle prossed, dismissed, and/or otherwise terminated in Plaintiff's favor.

58.   As a result of said actions, Plaintiff has suffered and will continue to suffer physical injuries, severe mental anguish, humiliation, disgrace, loss of dignity, as well as monetary losses for lost wages, legal fees and other costs and expenses.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant the State of Maryland finding it liable to Plaintiff and awarding her damages in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars), including compensatory damages and punitive damages in an amount to be determined at trial, plus her expenses, costs, and fees associated with the filing of this action, including reasonable attorney's fees, prejudgment interest, and such other and further relief as the Court deems just and proper.

**COUNT III**
**(False Arrest/False Imprisonment Against the State of Maryland**

59.   Plaintiff repeats and realleges the facts and particulars set forth in paragraphs 1 through 58 and incorporates them here.

60.   Defendant the State of Maryland, by and through its agents, servants, and employees, physically restrained, detained, and/or arrested Plaintiff maliciously and without reasonable suspicion to believe that Plaintiff had committed a crime, probable cause or a warrant and under circumstances demonstrating ill will, improper motive or evil purpose.

61.   As a result of said actions, Plaintiff suffered damages by being deprived of her liberty and detained against her will for an extended period of time and has suffered and continues to suffer physical injuries, severe mental anguish, humiliation, disgrace, loss of dignity, as well as monetary losses for lost wages, legal fees and other costs and expenses.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant the State of Maryland finding it liable to Plaintiff and awarding her damages in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars), including compensatory damages and punitive damages in an amount to be determined at trial, plus her expenses, costs, and fees associated with the filing of this action, including reasonable attorney's fees, prejudgment interest, and such other and further relief as the Court deems just and proper.

## COUNT IV
### (Battery Against the State of Maryland)

62.     Plaintiff repeats and realleges the facts and particulars set forth in paragraphs 1 through 61 and incorporates them here.

63.     The actions of the individual MTA Police Officers and the State of Maryland through the MTA Police Officers, who at all times were acting as its agents, servants, and employees when they were intentionally touching Plaintiff without her consent, were done deliberately and with actual malice.

64.     As a result of said actions, Plaintiff has incurred substantial expenses for medical treatment, loss of wages, as well as emotional injuries which continue to the present time.

WHEREFORE, Plaintiff claims damages against  Defendant the State of Maryland in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) to be determined by jury.

## COUNT V
### (Deprivation of Rights in Violation of 42 U.S.C. § 1983 and Articles 24 and 26 of the Maryland Declaration of Rights Against the State of Maryland)

65.     Plaintiff repeats and realleges the facts and particulars set forth in paragraphs 1 through 64 and incorporates them here.

66.     Acting under color of law, the MTA Police Officers, who at all times were acting as agents, servants, and employees of the State of Maryland, deprived Plaintiff of her constitutionally protected rights by physically restraining, detaining, and arresting her without probable cause or a reasonable suspicion to believe that she had committed a crime.

67.     The actions of the individual MTA Police Officers and Defendant the State of Maryland through the MTA Police Officers were intentional and were carried out with deliberate indifference to Plaintiff's constitutional rights and under circumstances demonstrating ill will, improper motive or evil purpose.

68.     After she immediately notified the police officers of her pregnancy, they continued to handle her body as if she was not pregnant.  The two officers were putting enormous weight on Dr. Daulatzai's pregnant body and Dr. Daulatzai was doing everything possible to prevent herself from falling down.  One officer restrained Dr. Daulatzai's leg as she attempted to move forward forcing Dr. Daulatzai to grab the seat backs to prevent herself from falling forward.  Continuing to restrain her leg was an act inconsistent with the United States Justice Department's Bureau of Justice Assistance's best practices in restraining pregnant women.

69.     The police officers acted inconsistent with best practices in restraining pregnant women because they did not believe Dr. Daulatzai when she told them she was pregnant. When she told them she was pregnant, they responded by saying "we don't know that" and "no, you're not."

70.     Further, while in custody, one of the police officers dismissed Dr. Daulatzai's claim that she was pregnant by stating, "Mexican women always lie about being pregnant."

71.     The police officers continued to demonstrate race-based animus when at the station they began "betting" on what Dr. Daulatzai's race and/or ethnicity is.  One officer exclaimed, "Ha! I told you she was a towel head!"

72.     When a friend of Dr. Daulatzai came to the station asking if she could see Dr. Daulatzai, the officers told Dr. Daulatzai's friend that Dr. Daulatzai was lying about being pregnant. Only after Dr. Daulatzai's friend verified to the police that Dr. Daulatzai was pregnant did the officers credit her claims, and they subsequently made a point of stating in the police report that they acted properly in handling her even though they obviously had not.

73.     By illegally seizing and detaining Dr. Daulatzai without a warrant, the police officers deprived her of the rights, privileges, and immunities guaranteed to Dr. Daulatzai

17

under Articles 24 and 26 of the Maryland Declaration of Rights.

74.    As a result of said actions, Plaintiff has suffered and will continue to suffer physical injuries, severe mental anguish, humiliation, disgrace, loss of dignity, as well as monetary losses for lost wages, legal fees and other costs and expenses.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant the State of Maryland finding it liable to Plaintiff and awarding her damages in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars), including compensatory damages and punitive damages in an amount to be determined at trial, plus her expenses, costs, and fees associated with the filing of this action, including reasonable attorney's fees, prejudgment interest, and such other and further relief as the Court deems just and proper.

### COUNT VI
### (Negligence Against All Defendants)

75.    Plaintiff repeats and realleges the facts and particulars set forth in paragraphs 1 through 74 and incorporates them here.

76.    Alternatively, Defendants Southwest Airlines and the State of Maryland, through their agents, servants and employees, were negligent in removing Plaintiff from Flight 1525 in the following respects:

> a.    Removing Plaintiff from Flight 1525 without probable cause.
>
> b.    Using unnecessary and excessive force in removing Plaintiff from the aircraft.
>
> c.    Wrongfully assuming Plaintiff had a food allergy.
>
> d.    Wrongfully assuming that Plaintiff had a deadly allergy to either food and/or dogs that posed a threat to her and/or other passengers aboard Flight 1525.

    e.       Failing to exercise the highest duty of care to  Plaintiff,  who was

     a fare paying  passenger  on a common carrier  aircraft.

    f.       And otherwise acting carelessly, recklessly, and/or negligently in having and/or removing Plaintiff from the plane.

WHEREFORE, Plaintiff claims damages against Defendants in an amount in excess of

$75,000.00 (Seventy-Five Thousand Dollars) to be determined by a jury.

   /s/ David Bana

David Bana (Bar No. 21292)
Law Office of David Bana, Esquire
129 Slade Avenue
Pikesville, Maryland 21208
(443) 742-2390

and

Tonya Bana (Bar No. 27326)
Tonya Bana LLC
129 Slade Avenue
Pikesville, Maryland 21208
(443) 890-8000

*Attorneys for Plaintiff*