## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DR. ANILA DAULATZAI,         *

      Plaintiff,              *

      v.                   *                        **CIVIL NO. JKB-21-0590**

STATE OF MARYLAND, *et al.*,    *

      Defendants.          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM

This case arises from Plaintiff's removal from a flight operated by Defendant Southwest Airlines Co. ("Southwest") in September 2017. Plaintiff has sought leave to file a Third Amended Complaint. (*See* ECF Nos. 55, 59.) In her proposed Third Amended Complaint, Plaintiff again brings claims against Southwest, the State of Maryland ("Maryland," and collectively with Southwest, "Defendants"), and now seeks to also bring claims against the five individual officers (the "Officer Defendants") who were involved in her allegedly unlawful removal from the Southwest flight and subsequent detention. (*See* Third Am. Compl. ("TAC") at 1, ECF No. 55-2.) Defendants oppose amendment on numerous grounds, including Plaintiff's failure to meet the standard set by Federal Rule of Civil Procedure 60(b) and that many of the factors bearing on amendment under Rule 15 disfavor amendment. (*See generally* ECF No. 60.) The Motion is fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the following reasons, a separate Order shall issue denying Plaintiff's Motion for Leave to file a Third Amended Complaint[1] (ECF Nos. 55, 59).

---

[1] The presently pending Motion was originally styled as a Motion for Relief from the Court's August 26, 2021 Opinion and Order, an Opportunity to be Heard on Judicially Notice Facts, and Leave to Amend. (*See* ECF No. 55.) The other

## I.    *Factual Background*[2]

On September 26, 2017, Plaintiff was ticketed to fly on Southwest Airlines Flight 1525 from Baltimore to Los Angeles, a flight she took routinely to care for her father. (TAC ¶¶ 11–12.) Before boarding the flight, Plaintiff noticed several dogs in the waiting area and asked a Southwest agent how many dogs would be on her flight. (*Id.* ¶¶ 13, 15.)  Plaintiff, who "has an allergy to dogs that, at its most extreme, causes itchy eyes and a runny nose," was informed that only one dog would be on the flight and that it would be seated near the front of the plane. (*Id.* ¶¶ 14–15.) To avoid aggravating her allergies, Plaintiff "took a seat near the rear of the aircraft," where she was informed by a flight attendant that there were, in fact, two dogs on the flight, but that both were seated near the front of the aircraft. (*Id.* ¶¶ 16–17.)  Plaintiff told the flight attendant that this was not problematic because although "she has a dog allergy, but it is not a *serious* one." (*Id.* ¶ 17 (emphasis added); *cf.* Second Am. Compl. ("SAC") ¶ 15 ("[Plaintiff] responded that she has a dog allergy, but it is not a *life-threatening* one.") (emphasis added), ECF No. 40.)

Shortly thereafter, another flight attendant approached Plaintiff and informed her "that, in the event that she needed an EpiPen, there was one on board the plane." (TAC ¶ 18.)  Plaintiff thanked the flight attendant but reiterated that her allergy was "not that severe and shared that she had never needed to use an EpiPen." (*Id.*)  Various other Southwest personnel followed up with Plaintiff about her allergy, "and each time she reiterated that her allergy was not a *serious* one."

---

relief sought was denied by prior Memorandum and Order of this Court. (*See* ECF No. 56.)  Accordingly, for brevity and clarity, the Court refers to currently pending Motion as a Motion for Leave to File a Third Amended Complaint.
[2] The facts in this Section are largely the same as those described in the Court's Memorandum dismissing Plaintiff's Second Amended Complaint, though Plaintiff makes additional allegations regarding her initial interaction with Captain Medeiros as well as more specific allegations regarding her removal from the flight and subsequent detention. (*Compare generally* TAC, *with* ECF No. 45.)  Although the Court ultimately denies leave to amend, it discusses the allegations in the Third Amended Complaint because those are the operative allegations for its futility analysis in Part IV.B.2.

(*Id.* (emphasis added); *cf.* SAC ¶ 16 ("each time she reiterated that her allergy was not *life-threatening*") (emphasis added).)

Plaintiff was then approached by "an older gentleman [she] subsequently learned was an MDTA police officer (and believes to be included among the Officer Defendants)" who asked if she had a food allergy. (TAC ¶ 19.) Plaintiff attempted to clarify that she had a dog allergy, but the officer insisted that various people told him that she had a food allergy and "that he had been called to discuss her food allergies." (*Id.*) After Plaintiff requested to speak to whoever informed the officer that she had a food allergy, he returned with Captain Darren Medeiros (the "Captain"), who immediately told Plaintiff, "I do not feel comfortable with you on this plane." (*Id.* ¶¶ 20–21.)

Plaintiff tried to explain to the Captain that "she did not have any food allergy and her dog allergy [was] not a *serious* one," and that "she was her sick father's primary caretaker and needed to be in Los Angeles the following morning." (*Id.* ¶ 22 (emphasis added); *cf.* SAC ¶ 19 ("She also reiterated that . . . her dog allergies are not *life threatening*.") (emphasis added).) While the Captain "acknowledged that [Plaintiff] did not have a food allergy" he "continued to assert without any further explanation that he did not feel comfortable with her on the plane [due to his understanding that] she had a 'life threatening' dog allergy." (TAC ¶ 22.) The Captain further informed Plaintiff "that he had already summoned additional police officers to escort her from the plane." (*Id.* ¶ 23.)

Plaintiff implored the Captain "to reconsider and directly asked him to 'call off' the police." (*Id.*)[3] During this conversation, the officer who previously spoke to Plaintiff advised the Captain, "I think [Plaintiff] knows her allergy better than we do. If she says it's not life-threatening and she flies often, why don't we just go?" (*Id.*) Apparently agreeing with this suggestion, "[t]he

---

[3] This entire paragraph is not alleged in Plaintiff's Second Amended Complaint, which instead alleges that Captain Medeiros did not acknowledge Plaintiff's explanation of her allergy or attempt to call off the officers but rather immediately requested that additional officers remove Plaintiff from the flight. (*See* SAC ¶¶ 19–21.)

Captain said he would try to 'call off' the other police officers and then walked to the rear of the aircraft, where he appeared to call or radio someone else." (*Id.*)

Plaintiff next alleges that, notwithstanding this conversation, "at the insistence of the Captain and other airline personnel, additional MDTA police officers, including, but not limited to, Officers McLhinney and Mossman, came aboard the aircraft and forcibly removed [her] from the plane without her consent and without probable cause[.]" (*Id.* at 25.) Specifically, she alleges that two MDTA police officers "began lifting [Plaintiff] out of her seat by her belt loops." (*Id.* ¶ 26.) Plaintiff, who was pregnant with her first child and concerned "about her health and that of her unborn child[,] immediately informed [them] that she was pregnant and . . . would walk off the aircraft by herself." (*Id.* ¶ 27.) Despite this, the officers "physically grabbed and dragged/pushed [Plaintiff] from the plane." (*Id.* ¶ 30.) Plaintiff alleges that the officers who removed her from the flight commented that "she looked like 'some sort of teacher' and said that she was 'going to learn a lesson today'" and then "high fived" each other after successfully removing Plaintiff from the flight. (*See id.* ¶¶ 26, 38.) She further alleges that the officers who removed her from the flight did not follow best practices for restraining pregnant women, did not believe that she was pregnant, and later stated that "Mexican women always lie about being pregnant." (*Id.* ¶¶ 31–36.) A passenger recorded a video of Plaintiff's removal from the flight, which ultimately went viral. (*Id.* ¶¶ 37, 47.) Southwest later issued at least two public statements about the matter. (*Id.* ¶¶ 48–49.)

Following her removal from the flight, Plaintiff alleges that she was "placed in a holding area for several hours[,]" during which her repeated requests to "call her husband, a friend, or an attorney" or to use the bathroom were denied. (*Id.* ¶ 39.) She was ultimately "placed under arrest without a warrant and charged with resisting arrest, disorderly conduct, disturbing the peace,

4

obstruction and hindering a police officer, and failure to obey a lawful order based on information the police officers knew to be false." (*Id.* ¶ 40.) In subsequent court proceedings, she received a probation before judgment on the charge of disorderly conduct with the remaining charges being dismissed *nolle prosequi*. (*Id.* ¶¶ 54–55.)

## II.    *Procedural History*

In December 2020, Plaintiff and her husband filed a Complaint in the Circuit Court for Anne Arundel County, Maryland alleging claims of battery, negligence, and loss of consortium against Southwest and Maryland. (*See generally* ECF No. 2.) After changing counsel, Plaintiff alone filed a First Amended Complaint. (ECF No. 3.) The First Amended Complaint omitted Plaintiff's husband's claim for loss of consortium and asserted a number of new claims, including federal claims for violation of 42 U.S.C. §§ 1981 and 1983. (*See generally id.*) After Defendants removed to federal court and moved to dismiss the First Amended Complaint (ECF Nos. 1, 13, 16), Plaintiff sought leave to file a Second Amended Complaint that she claimed was necessary because her First Amended Complaint "only included a bare bones recitation of the factual allegations giving rise to [Plaintiff's] additional claims and [ ] a second amendment was required to set forth a better statement of those claims." (*See* ECF No. 28-1 at 6.) The Court granted Plaintiff leave to amend (ECF No. 39), over Southwest and Maryland's arguments that such amendment would be futile because the Second Amended Complaint would be subject to dismissal for failure to state any claims. (*See* ECF No. 29.)

Southwest and Maryland then moved to dismiss the Second Amended Complaint, motions that the Court granted after Plaintiff filed no opposition. (*See* ECF Nos. 41, 42; *see also* ECF No. 45 at 1.) Plaintiff appealed the Court's Order dismissing the Second Amended Complaint. (ECF No. 52.) During the pendency of the appeal, Plaintiff filed a Motion in this Court seeking relief

5

from the judgment of dismissal under Federal Rule of Civil Procedure 60(b) or, alternatively, permission to file a Third Amended Complaint. (ECF No. 55.)  Given its limited jurisdiction due to Plaintiff's appeal, the Court denied Plaintiff's Motion insofar as it sought Rule 60(b) relief but issued an indicative Order under Federal Rule of Civil Procedure 62.1 with respect to the filing of a Third Amended Complaint. (*See* ECF No. 56.)  In its indicative Order, the Court explained that it was "doubtful that [the Third Amended Complaint] alleges sufficiently distinct facts to alter the viability of Plaintiff's claims" but that due to the "need for an expeditious order[,]" it could not definitively decide that leave to file a Third Amended Complaint could be denied as frivolous. (*Id.* at 10); *see also Fobian v. Storage Tech. Corp.*, 164 F.3d 887, 890 (4th Cir. 1999) (explaining that a district court should only exercise jurisdiction over a motion filed while a judgment is on appeal if that "motion is frivolous [and] a district court can promptly deny it without disturbing appellate jurisdiction over the underlying judgment").

Following this Court's indicative ruling, the Court of Appeals remanded the case "for the limited purpose of addressing [Plaintiff's] motion for reconsideration of dismissal order [and] leave to file an amended complaint." (*See* ECF No. 57.)  In supplemental briefing following remand, Plaintiff has sought an Order stating that this Court "would reopen her case and permit her to file the proposed Third Amended Complaint if the appellate court remanded the case" in full. (*See* ECF No. 65 at 2.)  Southwest and Maryland oppose Plaintiff's request for leave to file a Third Amended Complaint. (ECF No. 60.)

### III.    *Legal Standard*

Federal Rule of Civil Procedure 15(a) governs the standard for amending pleadings before trial and provides that:

> A party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required,

6

21 days after service of a responsive pleading or 21 days after service of a motion
under Rule 12(b), (e), or (f), whichever is earlier.

Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing

party's written consent or the court's leave. The court should freely give leave when justice so

requires." Fed. R. Civ. P. 15(a)(2). A court "may deny leave to amend for reasons 'such as undue

delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies

by amendments previously allowed, undue prejudice to the opposing party by virtue of the

allowance of the amendment, futility of amendment, etc.'" *Glaser v. Enzo Biochem, Inc.*, 464 F.3d

474, 480 (4th Cir. 2006) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

### IV.    *Analysis*

Defendants argue that this Court should deny Plaintiff leave to file a Third Amended

Complaint for three reasons. First, they argue that amendment is barred by the fact that Plaintiff

cannot obtain relief from the Court's judgment of dismissal under the standards set by Federal

Rule of Civil Procedure 60(b). (*See* ECF No. 60 at 2–10.) Second, they argue that even if this

Court reaches the Rule 15 analysis, numerous procedural issues—namely undue delay, failure to

cure, bad faith, and prejudice—bar amendment. (*Id.* at 10–19.) Third and finally, they argue that

amendment would be substantively futile because, like its predecessor, the Third Amended

Complaint would not withstand a Motion to Dismiss under Rule 12(b)(6). (*Id.* at 20–35.) The

Court concludes that, under current Fourth Circuit precedent, only the latter two arguments warrant

denying leave to amend.

### A. *Applicability of Rule 60(b)*

Defendant's initial argument is premised on the notion that Plaintiff must first vacate this

Court's prior judgment of dismissal under Rule 60(b) before she can seek leave to further amend

her Complaint. (*See* ECF No. 60 at 10.) Although the Fourth Circuit has suggested that "there is

one difference between a pre and a post-judgment motion to amend: the district court may not

grant the post-judgment motion unless the judgment is vacated pursuant to Rule 59(e) or Fed. R.

Civ. P. 60(b)," it has concluded that this difference is, functionally, immaterial because "a post-

judgment motion to amend is evaluated under the same legal standard as a similar motion filed

before judgment was entered—for prejudice, bad faith, or futility." *Laber v. Harvey*, 438 F.3d

404, 427 (4th Cir. 2006) (en banc).  Later cases confirm that:

> [A] district court may not grant a post-judgment motion to amend the complaint
> unless the court first vacates its judgment pursuant to Fed. R. Civ. P. 59(e) or 60(b).
> To determine whether vacatur is warranted, however, the court need not concern
> itself with either of those rules' legal standards. The court need only ask whether
> the amendment should be granted, just as it would on a prejudgment motion to
> amend pursuant to Fed. R. Civ. P. 15(a).

*Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 470–71 (4th Cir. 2011) (citing *Laber*, 438 F.3d

at 427).

Defendants ask this Court to set aside these holdings as dicta, arguing that all of the

published cases to apply *Katyle*'s reading of the *Laber* standard have considered amendments filed

within 28 days of a final judgment, *i.e.*, motions for which vacatur would be governed by Rule

59(e). (*See* ECF No. 60 at 12–13 (collecting cases)); *but cf. United States v. Shabazz*, 509 F. App'x

265, 266 (4th Cir. 2013) (unpublished) (vacating district court order denying motion to amend on

grounds that movant failed to show entitlement to relief under Rule 60(b)).  They contend that

although *Katyle* purported to address vacatur "pursuant to Fed. R. Civ. P. 59(e) or 60(b)[,]" later

cases have limited its analysis to the proposition that "Rule 15(a) and Rule 59(e) motions rise and

fall together." (*See* ECF No. 60 at 16 (quoting *Mayfield v. NASCAR*, 674 F.3d 369, 378–79 (4th

Cir. 2012)).)

While Defendants' arguments are persuasive, they fail to establish this Court's prerogative

to disregard the holdings in *Laber* and *Katyle*.  Although those cases do no deal directly with

8

vacatur under Rule 60(b), subsequent decisions by the Fourth Circuit have confirmed that they

mean what they say: in the context of a post-judgment amendment, "the court need only ask

whether amendment should be granted, just as it would on a prejudgment motion to amend

pursuant to Rule 15(a)." *See Shabazz*, 509 F. App'x at 266. At least one leading treatise similarly

confirms that "[t]he Fourth Circuit, curiously, takes a [unique] approach, analyzing a postjudgment

motion to amend under the liberal Rule 15(a) standard." 3 James Wm. Moore et al., *Moore's*

*Federal Practice – Civil* § 15.13 (2022). *But see* 6 Charles Alan Wright & Arthur R. Miller,

*Federal Practice and Procedure* § 1489 n.1 (3d ed. Apr. 2022) (hereinafter "Wright & Miller")

("The Fourth Circuit held that a district court may not deny a motion to amend simply because it

has entered judgment against the plaintiff . . . but the district court may not grant the post-judgment

motion unless the judgment is vacated pursuant to Rules 59(e) or 60(b).") (citing *Laber*, 438 F.3d

at 404). These authorities limit this Court to the observation that Plaintiff has provided no reason

for the Court to find that the Rule 60(b) standard is satisfied in this case, but preclude it from

finding that fact dispositive of the presently pending Motion. Rather, that Motion can be denied

by this Court only if it fails to meet the standards for amendment set out by Rule 15.

### B. Rule 15(a) Amendment

In considering motions to amend, "[t]he court should freely give leave [to amend] when

justice so requires." Fed. R. Civ. P. 15(a)(2). This language requires courts to adhere to a "policy

to liberally allow amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)."

*Scott v. Family Dollar Store, Inc.*, 733 F.3d 105, 112 (4th Cir. 2013) (internal quotation marks and

citation omitted). Thus, the opponent of a motion to amend must articulate some reason justifying

denial of leave "such as undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the

opposing party by virtue of the allowance of the amendment, or futility of amendment." *Glaser*, 464 F.3d at 480 (internal quotation marks and citation omitted). Defendants contend that here, nearly all of the typically enumerated reasons warrant denying leave to amend. (*See* ECF No. 60 at 18 (citing undue delay, failure to cure, bad faith, prejudice, and futility).)

### 1. Procedural Arguments

Other than their claim that the Third Amended Complaint is futile, Defendants' arguments are closely related and address the non-substantive aspects of Plaintiff's Third Amended Complaint and prior litigation conduct. Accordingly, the Court considers whether these arguments—undue delay, failure to cure, bad faith, and prejudice—warrant denying leave to file a Third Amended Complaint separately from its consideration of the merits of that proposed pleading. It concludes that both bad faith and prejudice each separately warrant denying leave to file a Third Amended Complaint.

#### a. Undue Delay

Plaintiff's Third Amended Complaint is undoubtedly delayed. "[A] motion to amend should be made as soon as the necessity for altering the pleading becomes apparent." *Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987). Even under the most generous interpretation of the record, Plaintiff's Motion to Amend should have been made shortly after August 26, 2021, when the Court dismissed Plaintiff's Second Amended Complaint. (*See* ECF Nos. 44, 45.) However, that Motion was not filed until December 2, 2021. (*See* ECF No. 55.) Plaintiff has not provided a reason for this three-month delay. *See Naden v. Saga Software, Inc.*, 11 F. App'x 381, 383 (4th Cir. 2001) (citing *Nat'l Bank of Wash. v. Pearson*, 863 F.2d 322, 328 (4th Cir. 1988)) ("[U]ndue delay can be inferred from the absence of explanation for the delay."); *see also Umanzor-Lazo v. U.S. I.N.S.*, 178 F.3d 1286, 1999 WL 274075, at *3 (Table) (4th Cir. 1999) (finding that motion to amend filed

10

two months after "the event triggering the motion to amend, [was] unduly delayed"). This significant and unexplained delay can only be described as undue.

Of course, "delay alone is an insufficient reason to deny [a] plaintiff's motion to amend." *Laber*, 483 F.3d at 427. Rather, delay has generally been considered a factor in determining whether a proposed amendment would be prejudicial or is sought in bad faith. *Id.* at 427 ("Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing."); Wright & Miller § 1487 ("When the court inquires into the good faith of the moving party, it typically will take account of the movant's delay in seeking the amendment."). Thus, the conclusion that Plaintiff's Motion is unduly delayed informs, but is not dispositive of, the Court's analysis of the non-substantive grounds for denying leave to amend.

### b. Failure to Cure

Most significant to the Court's conclusion that non-substantive aspects of this matter warrant denying leave to amend is the manner in which Plaintiff's pleadings have developed in this litigation. First, Plaintiff's prior amendments have failed to cure specific legal deficiencies that Defendants have long contended warrant dismissal. In particular, they have consistently argued that three barriers—the Airline Deregulation Act (the "ADA"), Plaintiff's probation before judgment ("PBJ") on disorderly conduct charges, and the Maryland Tort Claims Act—precluded the claims raised in Plaintiff's Complaints. (*See* ECF No. 16 (moving to dismiss First Amended Complaint largely on these grounds); ECF No. 45 (granting Motion to Dismiss Second Amended Complaint based on the ADA and the legal consequences of Plaintiff's PBJ).) As discussed further below, all three require focused inquiries to determine the legal plausibility of the claims alleged in this case. *See infra* Part IV.B.2. Plaintiff's multiple Amendments have not, however, provided concomitantly precise clarification or supplementation of her factual allegations to surpass those

threshold issues. Rather, those Amendments have each overhauled significant portions of Plaintiff's factual pleadings in a manner that does not squarely address Defendants' arguments, complicating motions practice but not altering its ultimate outcome. (*Compare* FAC, *with* SAC (additionally alleging a cover up by Southwest and racist and derogatory remarks by non-defendant police officers), *and* TAC (bringing claims against the Officer Defendants and alleging a conclusory conspiracy between them and Southwest).)

Importantly, these factual additions are also not based on recent developments and Plaintiff has articulated no reason why they could not have been included in an earlier pleading. (*See* ECF No. 28-3 (explaining that prior to filing the First and Second Amended Complaints, counsel "diligently reviewed approximately 2 reams worth of documents and watched and/or listened to extensive video and audio evidence"). Plaintiff's repeated, unsuccessful reframing of her pleading does not suggest that further leave to amend would be a productive exercise. *See Walker v. Trans Union, LLC*, Civ. No. PWG-16-3926, 2017 WL 4786625, at *3 (D. Md. Oct. 24, 2017) (internal quotation marks and citation omitted) ("When a party is granted leave to amend but fails to address the problem, that party should not be surprised when the court does not give it a third or fourth chance.").

### c. *Bad Faith*

More troublingly, Plaintiff's attempts to address some of these issues in her proposed Third Amended Complaint suggest two forms of bad-faith pleading. First, her Third Amended Complaint alleges facts that show some of the flaws that have persisted throughout her pleadings are, in fact, incurable. *See McCall-Scovens v. Blanchard*, Civ. No. ELH-15-3433, 2016 WL 6277668, at *8 (D. Md. Oct. 27, 2016) ("A good faith amendment must advance a colorable legal argument."). For example, Plaintiff's First and Second Amended Complaints failed to plead

12

compliance with the procedural requirements set out by the Maryland Tort Claims Act ("MTCA"),

Md. Code State Gov't §§ 12-101, *et seq.* (*See* ECF No. 16-1 at 14–16 (pointing out this deficiency

in the First Amended Complaint); ECF No. 41-1 at 14–15 (same with regards to the Second

Amended Complaint).) Though her Third Amended Complaint does allege satisfaction of these

requirements, it alleges that they were satisfied one year and one day after many of the claims

subject to the MTCA's requirements accrued. (*See* TAC ¶ 7.) As discussed at further length in

the Court's futility analysis, this allegation concedes that a number of her claims against Maryland

are time-barred and Plaintiff has not even attempted to show good cause for waiving this claim

bar. *See* Md. Code State Gov't § 12-106(c). The fact that Plaintiff has continued to allege and re-

allege these claims despite this deficiency suggests that her amendments have not been a good-

faith effort to allege only legally plausible claims.

Second, some facts newly alleged in Plaintiff's Third Amended Complaint are inconsistent

with facts alleged in prior pleadings as well facts established by other documents in this case. A

plaintiff who "adopt[s] contradictory factual positions in order to match their evolving legal

theories evidences a degree of bad faith sufficient to warrant denial of leave to amend." *Scott v.*

*Family Dollar Stores, Inc.*, 733 F.3d 105, 126 (4th Cir. 2013) (Wilkinson, J., dissenting);[4] *see also*

*Horton v. Vinson*, Civ. No. IMK-14-0192, 2015 WL 4774276, at *49 (N.D.W. Va. Aug. 12, 2015)

(finding plaintiff acted in bad faith where he did not "introduce at the earliest stage of the litigation

as possible, the matters upon which he wanted to rely in supporting his claims" even where plaintiff

did not adopt factually inconsistent positions) (internal quotation marks and citation omitted).

---

[4] The majority and concurring opinions in *Scott* do not appear to disagree with Judge Wilkinson's conclusion that pleading inconsistently can amount to bad faith. Rather, they reject his view that the plaintiffs' amended allegations in that case should be viewed as contradictory to their prior pleadings. *See Scott*, 733 F.3d at 118 ("[R]eview of the two complaints indicates that [plaintiffs] do not allege an entirely new theory in the amended complaint, but rather elaborate on one of two allegations that were previously plead in a conclusory fashion."), 119 ("[T]he majority has rendered a straightforward and limited decision: that the plaintiffs should be permitted to amend their complaint after a dramatic shift in the law.") (Keenan, J., concurring).

For example, in her prior pleadings, Plaintiff alleged that she repeatedly stressed to flight attendants that her dog allergy was "not life threatening." (*See, e.g.*, SAC ¶¶ 15–20.) In moving to dismiss her Second Amended Complaint, Southwest argued that these allegations rendered her claims of race discrimination implausible because under her description of her allergy, "a reasonable crewmember could understand that to mean her dog allergy was serious if not life-threatening." (ECF No. 41 at 8.) In granting that motion, the Court likewise noted that "Plaintiff allege[d] that multiple Southwest flight personnel believed she had a serious allergy" and that the Captain reasonably relied on these serious (if mistaken) concerns about the severity of Plaintiff's allergies in ordering her removal from the flight. (*See* ECF No. 45 at 6–7.)

Plaintiff's Third Amended Complaint has, in turn, removed all mention of Plaintiff introducing the phrase "life-threatening" into her dialogue with various Southwest employees, instead alleging that she repeatedly told them that "it is not a serious [allergy]." (*See, e.g.*, TAC ¶ 17.)[5] Indeed, she goes so far as to represent that the "proposed Third Amended Complaint was only revised to clarify that this phrase *was not* introduced by [Plaintiff] after Defendants disingenuously misled the Court[.]" (ECF No. 65 at 7 (emphasis in original).) This claim does not withstand scrutiny. The first time the phrase "life-threatening" is used in the prior Complaints is in the allegation that "[Plaintiff] responded that she has a dog allergy, but it is not a life-threatening one." (SAC ¶ 15.) This demonstrates that in her prior pleadings, Plaintiff herself alleged that she introduced the phrase into a conversation with a flight attendant. Additionally, the Third Amended Complaint now includes the unusual allegation that "even if [Plaintiff] had initially claimed that her pet allergy was life-threatening (which she did not) and only said that her

---

[5] Defendants also note that Plaintiff's original Complaint affirmatively alleged that she was removed from the flight "based upon a mistaken belief that she was highly allergic to dogs." (ECF No. 2 ¶ 12.) Though this allegation has been omitted from all of the Amended Complaints, it raises similar concerns of selective pleading.

allergy was not serious . . . upon learning she may have to deboard the plane[, the Captain's decision was still contrary to Southwest policy.]" (TAC ¶ 52.) It is difficult to square the inclusion of this counterfactual allegation with Plaintiff's view that her prior pleadings never alleged she had first introduced the phrase "life-threatening" in her conversations with Southwest employees. Reading these allegations in light of the prior Complaints—which both alleged that Plaintiff first used the particular phrase, "life-threatening"—the Court must conclude that the removal of that phrase in the Third Amended Complaint reflects a contradiction, rather than a clarification, of Plaintiff's previous allegations.

Similarly at odds with the prior record in this case is Plaintiff's allegation that "[i]nternal Southwest documents reveal that the Captain recognized that [Plaintiff] maintained her dog allergy was not life-threatening and that she never said such to any flight attendant." (TAC ¶ 58.) After Plaintiff made this allegation in her Second Amended Complaint (SAC ¶ 42), Southwest proffered the relevant documents in support of its Motion to Dismiss the Second Amended Complaint. (*See* ECF No. 42-3.)[6] Those documents call this allegation into serious doubt as they include an incident report by the Captain that states that a "Flight Attendant reported that the passenger said 'I am highly allergic so I hope you have an EpiPen so I don't die.'" (*Id.* at 17.) Although that report goes on to explain that the Captain suggested contacting a medical doctor to evaluate the severity of Plaintiff's allergy, it never suggests that the Captain credited Plaintiff's claim "[denying] ever saying [she was allergic] and that the Flight Attendant was lying." (*Id.*) The material difference between the contents of this document with Plaintiff's allegations regarding the same further

---

[6] Southwest avers that it also produced this documentation to Plaintiff in early 2018 as part of the criminal proceedings stemming from her arrest. (*See* ECF No. 42-1 at 38–39.) Other allegations regarding Southwest's documentation of the incident have been made in earlier iterations of Plaintiff's Complaint. (*See*, *e.g.*, ECF No. 3 at 30–31 (citing "written statements of Southwest employees" and "Southwest's business records").) As noted, however, these records were not before the Court until Southwest's Motion to Dismiss the Second Amended Complaint.

15

accentuates the Court's concerns that Plaintiff's amended pleadings are not a good-faith effort to clarify her claims.

In addition to these particularly illustrative examples, Plaintiff's Third Amended Complaint—like her prior pleadings—significantly revises her factual and legal claims. (*See* ECF No. 55-2 at 28–57 (redline comparison of Second and Third Amended Complaints).) For example, the Third Amended Complaint includes entirely new allegations of a conversation between Plaintiff and the Captain as well as additional allegations about and (for the first time) claims against the individual officers who removed Plaintiff from the flight. (*See* TAC ¶¶ 22–23, 56–100.) This repeated shifting of Plaintiff's allegations, which now border on the disingenuous, inclines the Court to conclude that her repeated amendments have not been a good-faith effort to crystallize and pursue viable claims. Rather, they are "a game of whack-a-mole in which plaintiffs plead, defendants defend, courts consider and rule, and then the process starts all over to satiate a plaintiff's hope she'll luck into something." *See Finicum v. United States*, Civ. No. SU-18-0160, 2021 WL 3502462, at *4 (D. Or. Aug. 5, 2021) (denying leave to file a third amended complaint); *see also Bioiberia Neb., Inc.*, 2021 WL 242494, at *2 ("[A] plaintiff who treats his complaint like the game of Battleship, moving the target across the board every time it suffers a fatal blow, acts in bad faith, and should not be entitled to leave to amend.") This gamesmanship warrants denying leave to amend.

### d. *Prejudice*

This gamesmanship is not only problematic in the abstract: it has also caused significant prejudice to Defendants. In the context of a post-judgment amendment, prejudice is typically determined by the state of the case and generally, "the further the case progressed before judgment was entered, the more likely it is that the amendment will prejudice the defendant." *Laber*, 438

F.3d at 427. Courts have also concluded, however, that prejudice sufficient to deny leave to amend can also accrue where a plaintiff's pleadings are repeatedly dismissed. *See Glaser*, 464 F.3d at 480 ("We conclude that the district court did not abuse its discretion in ruling that the plaintiffs' many opportunities to present their claim warranted denial of the motion to amend."); *Walker*, 2017 WL 4786625, at \*3 (internal quotation marks and citation omitted) ("When a party is granted leave to amend but fails to address the problem, that party should not be surprised when the court does not give it a third or fourth chance.").

Here, Defendants argue that they have been prejudiced by being required to spend a year and "*substantially more* than $100,000" litigating the serious allegations in Plaintiff's Complaints. (*See* ECF No. 60 at 26, 26 n.3 (emphasis in original).) Plaintiff, in turn, argues that this prejudice is Defendants' fault since they "are the ones who made a strategic decision to repeatedly file serial, redundant motions to dismiss predicated on alleged defects that could be easily cured and/or did not warrant dismissing the case." (*See* ECF No. 60 at 5–6.) This argument belies the record in this case. Not once has Plaintiff opposed a Motion to Dismiss any of her Complaints—the logical route if they "did not warrant dismissing the case." (*Id.*) Moreover, despite her assertion that the flaws in her Complaint are "easily cured," she has still failed to do so as confirmed by this Court's futility analysis. *See infra* Part IV.B.2.

Although this case has not progressed past the pleading stage, the Court concludes that Plaintiff's repeated failure to cure threshold legal flaws in her pleadings and the costs imposed thereby on Defendants have been sufficiently prejudicial to warrant denying leave to file a Third Amended Complaint. The Court emphasizes that the prejudice imposed on Defendants is sufficient to deny leave to amend even if Plaintiff's amendments had been sought in good faith. *See Mayfield*, 674 F.3d at 379 (quoting *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576

17

F.3d 172, 193 (4th Cir. 2009)) ("[A] request to amend should only be denied if one of three facts is present: 'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile.'").

### 2. *Futility*

Providing at least a third independent ground for denying Plaintiff's Motion for Leave to file a Third Amended Complaint is the fact that the proposed Third Amended Complaint would be futile. In a prior Memorandum, this Court noted that futility exists "when the proposed amendment is clearly insufficient and frivolous on its face." (*See* ECF No. 38 at 4 (quoting *Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869, 880 (4th Cir. 2020)).) Defendants argue that this narrower view of futility overlooked "recent Fourth Circuit cases [which] have held it is appropriate to deny amendment if the pleading would not survive a motion to dismiss." (ECF No. 60 at 20.)   The Fourth Circuit has, in fact, explicitly confirmed that district courts have this authority, explaining that although "[t]raditionally, we held that a proposed amendment was 'futile' if it was 'clearly insufficient or frivolous on its face' . . . in recent years, we have made clear that district courts are free to deny leave to amend as futile if the complaint fails to withstand Rule 12(b)(6) scrutiny." *In re Triangle Cap. Corp. Sec. Lit.*, 988 F.3d 743, 750 (4th Cir. 2021) (citations omitted).   Thus, the Court considers the proposed Third Amended Complaint under the ordinary standard for dismissal under Federal Rule of Civil Procedure 12(b)(6).[7]   Doing so confirms that granting leave to amend would be futile because the Third Amended Complaint fails to state any plausible claims.

### a. *Claims Against the Officer Defendants*

For the first time, Plaintiff attempts to plead claims against the five officers who were allegedly involved in removing her from the flight. (*See* TAC ¶ 5.) Specifically, she now names

---

[7] As noted, the facts alleged by the Third Amended Complaint—accepted as true for purposes of the Court's futility analysis—are the ones described in the background section of this Memorandum. *See supra* Part I.

those officers as defendants with respect to every Count, collectively alleging: (1) discrimination in violation of 42 U.S.C. § 1981; (2) malicious prosecution; (3) false arrest and imprisonment; (4) battery; and (5) a § 1983 claim based on deprivation of her Fourth and Fourteenth Amendment rights. (*See id.* ¶¶ 56–100.)  While Defendants point out various substantive flaws with these allegations, the most obvious deficiency is that these claims do not relate back to any prior pleading and are, accordingly, time-barred. *See United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000) ("Where the statute of limitations bars a cause of action, amendment may be futile and therefore can be denied.") (collecting cases); (*see also* ECF No. 60 at 32 (arguing that "[t]he claims against the five new defendants all are time-barred on their face")).

### i.   *Limitations Period for Plaintiff's Section 1981 Claim*

"Generally, § 1981 claims are governed by the most analogous state statute of limitations." *Stewart v. Univ. N.C. Sys.*, 673 F. App'x 269, 271 (4th Cir. 2016) (citing *James v. Cir. City Stores, Inc.*, 370 F.3d 417, 420 (4th Cir. 2004)). The exception to this general rule is where "a claim is based on § 1981(b), which covers claims based on conduct occurring after the formation of the contractual relationship" and are subject instead to the "federal four-year statute of limitations[.]" *Id.* Here, Plaintiff alleges "conduct occurring after the formation of the contractual relationship" and the more generous four-year limitations period applies. *Id.*; *see also* Md. Code Ann. Cts. & Jud. Proc. § 5-101 (2020) (prescribing general three-year statute of limitations for civil claims). Thus, Plaintiff's claim is timely if it accrued on or after December 2, 2017. (*See* ECF No. 55 (filed December 2, 2021).)

"Under federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done [ ] that reasonable inquiry will reveal [a] cause of action." *Nasim v. Warden*, 64 F.3d 951, 955 (4th Cir. 1995); *see also Howell v. Cnty. Comm'n of Hampshire Cnty.*, App. No.

21-1023, 2022 WL 61428, at *1 (4th Cir. Jan. 6, 2022) ("[A] cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice . . . to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim."). Based on the pleadings, a claim that the Officer Defendants racially discriminated against Plaintiff in removing her from the flight accrued on that day, September 26, 2017, given Plaintiff's allegations that at least some of the Officer Defendants made a number of overtly racist remarks during her removal. (*Id.* ¶¶ 34, 77–79.) These allegations confirm that Plaintiff was immediately "on notice . . . that inquiry would reveal the existence of a colorable claim" for racial discrimination, *Howell*, 2022 WL 61428, at *1, and Plaintiff does not provide any reason for the Court to conclude the contrary. Thus, her § 1981 claim against the Officer Defendants is facially untimely by more than two months.

### *ii.   Limitations Period for Remaining Claims*

Plaintiff's remaining claims against the Officer Defendants can be grouped together for purposes of assessing their timeliness. All of Plaintiff's state law claims are subject to Maryland's general, three-year statute of limitations. *See* Md. Code. Cts. & Jud. Proc. § 5-101; *see also Hovatter v. Widdowson*, Civ. No. CCB-03-2904, 2004 WL 2075467, at *7–*8 (D. Md. Sep. 15, 2004) (applying three-year limitations period to claims for malicious prosecution, false arrest, and false imprisonment); *Ford v. Douglas*, 799 A.2d 448, 451 (Md. Ct. Spec. App. 2002) (concluding battery was subject to Maryland's general statute of limitations). The same is true for Plaintiff's § 1983 claims because for such claims courts "apply the statute of limitations for personal injuries of the state in which the alleged violation occurred." *DePaola v. Clarke*, 884 F.3d 481, 487 (4th Cir. 2018); *see also Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 388 (4th Cir. 2014) (concluding three-year statute of limitations applied to § 1983 claims borrowing Maryland law).

Given that this limitations period is shorter than the period for Plaintiff's § 1981 claim, her remaining claims are similarly time-barred unless they accrued a later date.

The only claims which accrued at a later date are Plaintiff's claims for malicious prosecution, though their accrual still predates her Third Amended Complaint by more than the relevant three years.   Under both state and federal law,[8] "[f]or a 'claim' to exist for purposes of accrual, 'all of the elements must have occurred.'" *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020); *see also Heron v. Strader*, 761 A.2d 56, 59 (Md. 2000) (citations omitted) ("[A] cause of action is said to have arisen, 'when facts exist to support each element.'"). Because an element of malicious prosecution is "termination of the proceeding in favor of the plaintiff"—it does not accrue until a favorable resolution is reached in the underlying criminal proceeding. *Heron*, 761 A.2d at 59. Here, this occurred (in Plaintiff's view) in March 2018, when "[t]he state judge accepted [Plaintiff's] plea and imposed probation before judgment." (TAC ¶¶ 54–55.)   Therefore, this final claim was time-barred as of March 2021, substantially before Plaintiff filed her Third Amended Complaint.

### iii.    Relation Back

Given that all of Plaintiff's claims are time-barred on the face of the Third Amended Complaint, amendment to allow those claims would be futile unless they relate back to an earlier pleading.   Relevant here, Rule 15(c)(1)(C) permits relation back of an "amendment chang[ing] the party or the naming of the party against whom a claim is asserted" if "the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on

---

[8] Even where a federal law borrows a state statute of limitations, federal law continues to govern "when the cause of action 'accrues.'" *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 320 (4th Cir. 2006) (citation omitted).

the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(a).[9]

Under the latter requirement, "[r]elation back will be refused only if the court finds that there is no reason why the party to be added should have understood that it was not named due to a mistake." Wright & Miller § 1498.3. Such a finding can be made where the "decision not to include [certain defendants] reflected 'a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties.'" *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 371–72 (4th Cir. 2014) (quoting *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 549 (2010)). Here, Plaintiff certainly had the necessary factual predicates to sue the individual officers, who she identified by name and badge number in her initial Complaint. (ECF No. 2 ¶ 2); *see also Crostley v. Lamar Cnty., Tex.*, 717 F.3d 410, 421 (5th Cir. 2013) (denying relation back where "[plaintiff] clearly knew [defendant's] identity as early as the original pleadings, as he is included in that complaint's factual allegations"). She also fails to establish (or even argue) that she did not appreciate the significant legal difference between suing the state and suing the individual officers up until her Third Amended Complaint. *See Covey v. Assessor of Ohio Cnty.*, 666 F. App'x 245, 248 (4th Cir. 2016) (citing *W. Contracting Corp. v. Bechtel Corp.*, 885 F.2d 1196, 1200 (4th Cir. 1989)) ("[W]hen relation back is required to satisfy the statute of limitations, the burden is on the plaintiff to prove that Rule 15(c) is satisfied.") The Court must therefore conclude that Plaintiff's claims against the Officer Defendants do not relate back to her earlier pleadings and are therefore untimely. Amendment to add the Officer Defendants and allege claims against them would be futile.

---

[9] Relation back of an amendment adding a party also required that Rule 15(c)(1)(B) be satisfied, i.e., that "the amendment assert[] a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." *See* Fed. R. Civ. P. 15(c)(1)(C). Defendants do not argue that Plaintiff could not satisfy this prerequisite of relation back.

### b. *Claims Against Southwest and Maryland*

As to themselves, Defendants argue that Plaintiff's claims are futile because none would

survive a motion to dismiss for the reasons articulated in their Motions to Dismiss the Second

Amended Complaint, as well as additional reasons unique to the proposed Third Amended

Complaint. (*See* ECF No. 60 at 20 (incorporating by reference Motion to Dismiss SAC); 21–35

(making additional arguments regarding futility).)   Plaintiff, for her part, has largely failed to

substantiate her initial claim that "[t]he proposed amendment would not be futile because it cures

all of the defects the Court noted in dismissing [Plaintiff's] claims and all other alleged deficiencies

Defendants pointed out in the motions to dismiss." (ECF No. 55 at 4.)  Other than an additional

legal argument as to why she believes her PBJ on a count of disorderly conduct does not bar several

of her claims, her remaining argument is limited to a single paragraph, the gravamen of which is

that "Defendants have not identified any controlling authority establishing that [Plaintiff's] claims

are inadequately pled as a matter of law." (*See* ECF No. 59 at 7–8 (addressing Plaintiff's PBJ);

ECF No. 65 at 8 (remaining argument against futility of amendment).)[10]

A review of Plaintiff's claims shows that this argument is far too limited to sustain her

Third Amended Complaint in light of the significant authorities marshaled by Defendants to show

that all of her claims fail as a matter of law.  To reiterate, Plaintiff brings claims against Southwest

for violation of 42 U.S.C. § 1981 (Count I); Malicious Prosecution (Count II); False Arrest/False

---

[10] Plaintiff appears to suggest that she proffers limited analysis because "the Court's January 11, 2022 Order flagged two issues that may warrant further elaboration in addressing how the proposed amendment 'would not be futile.'" (ECF No. 59 at 2 (citing ECF No. 58 at 2).)  However, that prior Order explicitly stated that the Court believe Plaintiff's analysis was not exhaustive of how "the proposed amendment . . . cures *all of the defects* the Court noted in dismissing [Plaintiff's] claims and *all the other alleged deficiencies* Defendants pointed out in the motions to dismiss." (ECF No. 58 at 2 (emphases added).)  While it did provide a pair of illustrative examples, "*[f]or instance*" the Court does not believe that a fair reading of its prior Order suggested it was seeking only this limited analysis. (*Id.* at 2 n.2 (emphasis added).)  Even to the extent that this misreading limited Plaintiff's discussion of the merits of her claims in her initial supplement, Defendants' Opposition should have prompted a more fulsome discussion regarding the futility of those claims.

Imprisonment (Count III); Battery (Count IV); and violations of 42 U.S.C. §§ 1983, 1985(3), as well as Articles 24 and 26 of the Maryland Declaration of Rights (Count V). With the exception of Count I, Plaintiff brings the same claims against Maryland.

### i.   *Section 44902(b) Bar*

Southwest argues that Count I of the Third Amended Complaint fails to state a § 1981 claim because she fails to plausibly allege that the pilot's decision to remove her was arbitrary and capricious—as required to surmount the bar imposed by surmount the bar imposed by 49 U.S.C. § 44902(b). Generally, airlines have broad authority to decline to carry passengers for safety reasons because "Congress has, by statute, explicitly given safety the highest priority." *Cerqueira v. Am. Airlines, Inc.*, 520 F.3d 1, 13 (1st Cir. 2008). This authority is textually enumerated in 49 U.S.C. § 44902(b), which provides that "an air carrier . . . may refuse to transport a passenger or property the carrier decides is, *or might be*, inimical to safety." 49 U.S.C. § 44902(b) (emphasis added). While § 44902(b) does not preclude a plaintiff from challenging a removal decision through a § 1981 claim, it does require that "the air carrier's decision to refuse air transport must be shown to be arbitrary or capricious." *Cerqueira*, 520 F.3d at 14; *see also Karrani v. Jet Blue Airways Corp.*, 825 F. App'x 535, 536 (9th Cir. 2020) (same); *Xiaoyun Lucy Lu v. AirTran Airways, Inc.*, 631 F. App'x 657, 661 (11th Cir. 2015).

"In cases involving removal from flights under § 44902, it is the decision by the pilot in charge who refuses passage which stands as the decision of the air carrier." *Cerqueira*, 520 F.3d at 14. That analysis must also be cognizant of the fact that "air carriers often must make decisions within moments of take-off and with less than perfect knowledge." *Cordero v. Cia Mexicana De Aviacion, S.A.*, 681 F.2d 669, 672 (9th Cir. 1982); *see also Dasrath v. Continental Airlines, Inc.*, 228 F. Supp. 2d 531, 539 (D.N.J. 2002) ("[T]he objective assessment of a carrier's decision must

24

take into account all the circumstances surrounding the decision, including the (perhaps limited) facts known at the time; the time constraints under which the decision is made; and, not least, the general security climate in which events unfold."). Thus, (1) "[r]eview of a decision to refuse transport by the Captain is restricted to what information was actually known by the decisionmaker at the time of the decision"; (2) "The Captain (or other decisionmaker) is entitled to accept at face value the representations made to him by other air carrier employees"; and (3) "[t]he biases of a non-decisionmaker may not be attributed to the decisionmakers." *Cerqueira*, 520 F.3d at 14–15.

Applying these principles shows that Plaintiff still fails to plausibly allege that Southwest's decision to remove her from the flight was arbitrary and capricious. As before, Plaintiff alleges that Southwest personnel clearly evinced a concern for her allergy, repeatedly engaging her on the topic and even explaining that there was an EpiPen on board in case she had an allergic reaction. (TAC ¶¶ 17–19.) Similarly, she continues to allege that these concerns escalated to the point where "the flight attendants threatened the Captain with an unauthorized, unlawful, wildcat strike, if he did not order [Plaintiff] removed." (*Id.* ¶ 63.)[11] Although she alleges that the "Captain recognized that [Plaintiff] maintained that her dog allergy was not life-threatening[,]" she does not explain why it was arbitrary or capricious of the Captain to privilege the views of his entire flight crew over Plaintiff's "maintained" position.[12] (*Id.* ¶ 58); *Karrani*, 825 F. App'x at 536 ("Considering the attendant's report even if, on hindsight, it is exaggerated, the airline pilot's opinion under § 44902 was justified by a reasoned and rational appraisal of the facts known to the pilot at the time

---

[11] The Third Amended Complaint now asserts, for the first time, that the Captain spoke with Plaintiff about her allergy and her need to be on the flight and ultimately "said he would try to 'call off' the other police officers." (TAC ¶ 23.) Immediately after this, however, it asserts that Plaintiff was removed from the flight "at the insistence of the Captain[.]" (*Id.* ¶ 25.) Plaintiff's allegations do not reconcile this apparent about-face by the Captain.

[12] Plaintiff suggests that the Captain was required to do so based on a Southwest Policy document titled "Animal Allergies – Resolving Conflicts for Allergic Customers." (TAC at 27.) However, as Southwest points out, that document provides guidance to *boarding* personnel and that guidance is permissive, rather than mandatory, in permitting boarding to a customer who states she will be okay to travel despite an animal allergy. (*Id.*) For both reasons, it is an inapposite metric against which to measure the arbitrariness of the Captain's decision.

and was not arbitrary or capricious."); *Cerqueira*, 520 F.3d at 15 (quoting *Al-Qudhai'een v. Am. W. Airlines, Inc.*, 267 F. Supp. 2d 841, 848 (S.D. Ohio 2003)) ("[T]he pilot 'is entitled to rely on the information provided to him by his crew despite any exaggerations or false representations."); *Christel v. AMR Corp.*, 222 F. Supp. 2d 335, 340 (E.D.N.Y. 2002) ("A captain of an airplane is entitled without further inquiry to rely upon a flight attendant's representations that a conflict with a passenger might distract the flight attendant from performing his or her safety-related duties."). Given that the Captain was not required to further investigate or resolve the disputed severity of Plaintiff's allergies, his decision to adopt his flight attendants' view of the situation is not facially arbitrary or capricious. *Cerqueira*, 520 F.3d at 15 ("[T]here is no obligation on the part of the Captain . . . to make a thorough inquiry into the information received, the source of that information, or to engage in an investigation . . . The Captain [ ] is entitled to accept at face value the representations made to him by other air carrier employees."). Accordingly, Plaintiff's § 1981 claim against Southwest in the Third Amended Complaint is facially barred by 49 U.S.C. § 44902(b).

### *ii.     Section 1981 Claim*

Of course, a facially reasonable decision may be shown to be arbitrary and capricious if it is the result of racial animus. *See Al-Watan v. Am. Airlines, Inc.*, 570 F. Supp. 2d 925, 931 (E.D. Mich. 2008) ("[P]laintiff's complaint satisfied the 'basic requirement' that the defendant's motivation did not involve safety concerns, but rather [was] an arbitrary decision motivated by racial animus."). Here, however, Plaintiff fails to plausibly allege that racial animus was the but-for cause of the Captain's decision to remove her from the flight as required to state a § 1981 claim.[13] *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014

---

[13] Although Plaintiff conclusorily alleges that "the Captain cave[d] to the *racist* demands of his flight crew" (TAC ¶ 64), she provides no factual support for her view that those demands were racist or that the flight crew's racial animus

(2020) (requiring § 1981 plaintiffs to plead but-for causation between animus and injury); *see also Mercer v. Southwest Airlines Co.*, Civ. No. MEJ-13-5057, 2014 WL 4681788 at *7 (N.D. Cal. Sept. 19, 2014) ("[A]lthough Plaintiff has alleged that he was treated unfairly by Southwest flight crew, he does not allege any facts that link the mistreatment to intentional racial discrimination."). The failure of the Third Amended Complaint to demonstrate the Captain's discriminatory animus compels the Court to conclude that his facially reasonable decision to remove her from the flight is protected by § 44902(b).

Although Plaintiff's Third Amended Complaint makes a number of allegations that Southwest took actions that "would not have been necessary had [Plaintiff] been removed for legitimate, non-discriminatory safety reasons[,]" (TAC ¶¶ 63–65), she fails to support these conclusions with any allegation that the Captain acknowledged or even considered her race at any time before she was removed from the flight. *See Mercer*, 2014 WL 4681788, at *7 (granting Motion to Dismiss where "Plaintiff does not allege that he was treated differently than similarly situated Caucasian passengers on the flight, or that there was any reference to his race at all").

Rather, she appears to allege that animus can be inferred from the Captain's actions when "spoke down to her in an aggressive and abusive tone[,]" and the fact that, "after takeoff, the Captain demanded that each flight attendant meet with him individually in the cockpit 'to discuss the matter.'" (TAC ¶¶ 64–65.) These allegations do not plausibly establish that racial animus motivated the Captain's decision.

First, the conclusory allegation about the Captain's tone appears inconsistent with Plaintiff's factual allegations that although the Captain initially stated that he "d[id] not feel

---

was communicated to or adopted by the Captain. Absent further allegations, the fact that the flight attendants may have individually (or collectively) harbored unspoken racial animus is irrelevant to the Court's analysis because generally, "[t]he biases of a non-decisionmaker may not be attributed to the decisionmakers." *Cerqueira*, 520 F.3d at 15 (citing *Al-Qudhai'een*, 267 F. Supp. at 848).

comfortable with [plaintiff] on this plane[,]" he ultimately heard her side of the story and relented, stating that he would "try to 'call off' the other police officers[.]" (*Id.* ¶¶ 21–23.) While the remainder of the allegations aver that the Captain ultimately had Plaintiff removed from the flight (*id.* ¶ 25), they do not suggest—except in a conclusory fashion—that the Captain's interactions with Plaintiff establish that he acted based on discriminatory animus. *See Skeete v. N. Am. Partners in Anesthesia, LLP*, Civ. No. ELH-10-2704, 2012 WL 27181, at *13 (D. Md. Jan. 4, 2012) ("Nor does [defendant's] alleged harsh, rude manner or unfriendliness towards plaintiff establish racial animus."); *Gibbs v. Smitherman*, Civ. No. WEB-10-0186, 2012 WL 6093805, at *6 (E.D.N.C. Dec. 7, 2012) ("[T]he fact that [defendants] were arrogant and may have talked down to plaintiff or may have been rude to her simply does not show that any of these individuals were motivated by a discriminatory animus.").

Second, her allegation that discussions between the Captain and flight attendants would not have been necessary absent a need to cover up a decision motivated by racial animus is implausible based on the allegations in the Third Amended Complaint. (*See* TAC ¶ 65.) The Third Amended Complaint makes clear that Plaintiff, a pregnant woman, was violently removed from the flight in a videotaped situation that Plaintiff alleges was "disturbing and obviously racist." (*Id.* ¶¶ 30, 37, 47.) Plaintiff provides no explanation why the Captain's decision to meet with his crew following such a significant incident creates an inference of animus on the Captain's part at the time he decided to remove Plaintiff from the plane.[14]

---

[14] Notably, although Plaintiff implies that the purpose of these meetings was to align the written statements of the flight crew, it is exactly those statements that Plaintiff alleges reveal the racially discriminatory nature of the Captain's decision to remove her from the flight. (*See* TAC ¶ 65 ("These meetings occurred before any flight attendant wrote a statement. Engaging in such a conspiracy would not have been necessary had [Plaintiff] not been removed for legitimate, non-discriminatory safety reasons.").)

28

At best, Plaintiff's allegations establish that the Captain made a mistake in removing her from the flight and that the consequences of this mistake escalated dramatically when Plaintiff's removal required police intervention.  However, those allegations fail to provide specific facts showing that the Captain's removal decision was not merely a mistaken read of a tense and time-sensitive situation, but rather an affirmative acceptance of a false narrative based on racial animus. Under modern pleading standards, where a Court is faced with a choice between an "obvious alternative explanation . . . and the purposeful, invidious discrimination [a plaintiff] asks [it] to infer, discrimination is not a plausible conclusion." *Iqbal*, 556 U.S. at 682.  While the Captain may have mistakenly reached the conclusion that Plaintiff could not fly given her allergies, there are simply no allegations establishing that the but-for cause of this conclusion was racial animus rather than a good-faith mistake made under significant pressure.  The factual allegations establish that the Captain faced significant concerns from his flight crew, that—though he was predisposed to accept those concerns—he discussed them with Plaintiff and acknowledged her contrary view, but that he ultimately decided to have Plaintiff removed from the flight.  (TAC ¶¶ 58 ("[T]he Captain recognized that [Plaintiff] maintained that her dog allergy was not life-threatening."), 62 ("[T]he flight attendants on [Plaintiff's] flight approached the [Captain] and demanded that he order [Plaintiff] off the plane."), 64.)  Absent facts that more explicitly suggest the Captain's decision-making process was tainted by animus, the "obvious alternative explanation" that the flight crew mistakenly overreacted to Plaintiff's allergy renders her attempt to imply racial animus implausible. *See Tambedou v. Fundamental Clinical & Op. Servs., LLC*, Civ. No. DKC-19-2822, 2020 WL 5544199, at *4 (D. Md. Sept. 16, 2020) (concluding allegations of racial animus were implausible where "the complaint itself not only fails to allege facts supporting race discrimination but also supplies reasons for the actions that had nothing to do with discrimination").  Plaintiff's

failure to adequately plead a § 1981 claim further confirms that the Captain's decision—even if

mistaken in hindsight—was not arbitrary or capricious. *See Shaffy v. United Airlines, Inc.*, 360 F.

App'x 729, 730 (9th Cir. 2009) ("Even assuming *arguendo* that the flight attendants overreacted

to the situation, the captain was entitled to accept at face value the representation made to him by

his flight crew. Furthermore, there is no evidence that [plaintiff's] Iranian heritage played any role

in the incident or that the airline was even aware of it.").

### iii.    *Malicious Prosecution*

Plaintiff's next claim, for malicious prosecution—whether brought under the common law,

the Maryland Declaration of Rights, or 42 U.S.C § 1983—continues to be barred by the fact that

she cannot show a "favorable termination" of her criminal proceedings. *See Heck v. Humphrey*,

512 U.S. 477, 484 (1994) ("One element that must be alleged and proved in a malicious

prosecution action is termination of the prior criminal proceeding in favor of the accused."); *State*

*v. Meade*, 647 A.2d 830, 838 (Md. 1994) ("One of the elements of the tort of malicious prosecution

is that the criminal prosecution terminate in favor of the accused."). In the filings related to her

Third Amended Complaint, Plaintiff takes the position that "the PBJ as to the disorderly conduct

charge does not preclude [her] from pursuing malicious prosecution claims based on the remaining

charges that were *nolle prossed*." (ECF No. 59 at 8.)[15]  In her view, her "disorderly conduct, *i.e.*

yelling, only commenced after the police officers unlawfully seized her, which clearly does not

and cannot establish that there was probable cause for her forcible removal from the plane *before*

the officers touched her." (*Id.*)

---

[15] To the extent that Plaintiff continues to object to the Court's taking judicial notice of this fact, that contention is
mooted for purposes of this Motion because the Third Amended Complaint affirmatively alleges that Plaintiff received
a PBJ. (TAC ¶ 55.) Moreover, Plaintiff has now had the opportunity "to be heard on the propriety of taking judicial
notice and the nature of the fact to be noticed[,]" as required by Federal Rule of Evidence 201(e) and the Court has
rejected her arguments against taking judicial notice of her PBJ as frivolous. (ECF No. 56 at 4.)

This argument, however, appears to conflate two distinct elements required to plead malicious prosecution. To establish malicious prosecution under either state or federal law, a plaintiff must allege, *inter alia*, both that a "suit or proceeding was instituted without probable cause" and that "the prosecution terminated in the acquittal or discharge of the accused." *Thompson v. Clark*, 142 S. Ct. 1332, 1338 (2022); *Heron v. Strader*, 361 Md. 258, 264 (Md. 2000) (same). While Plaintiff's argument appears to suggest that her PBJ does not establish the former, she provides no argument or authority as to why it does not categorically preclude her from establishing the latter.

"The favorable termination element . . . is satisfied when the 'criminal case against the plaintiff has been disposed of in a way that indicates the plaintiff's innocence.'" *Salley v. Myers*, 971 F.3d 308, 313 (4th Cir. 2020) (quoting *Snider v. Seung Lee*, 584 F.3d 193, 202 (4th Cir. 2009) (Stamp, J., concurring)).[16] Under Maryland law, where a prosecution results in conviction on only some charges, "a court should consider a plaintiff's *overall* innocence of the prior charges, as an entire course of conduct, when that course of conduct arose from the same underlying act(s)." *Albertson v. Scherl*, App. No. 15-2329, 2017 WL 2687763, at *10 (Md. Ct. Spec. App. June 22, 2017) (emphasis added); *Salley*, 971 F.3d at 313 ("[State law] informs our inquiry because § 1983 malicious prosecution claims sound in common law."). In this holistic analysis, "the abandonment of charges due to a compromise or an act of mercy typically does not imply innocence." *Salley*, 971 F.3d at 313. Here, Plaintiff alleges that "the Anne Arundel County prosecutor agreed to allow [Plaintiff] to plead not guilty to a single charge of disorderly conduct . . . to recommend that she

---

[16] The Supreme Court's recent holding in *Thompson* does not appear to alter this requirement, but rather holds that a plaintiff against whom charges are entirely dismissed does not need to show "an affirmative indication of innocence." *Thompson*, 142 S. Ct. at 1340. Indeed, *Thompson* appears to reject the proposition that mixed verdicts can lay the groundwork for a malicious prosecution claim by stating that a Plaintiff "need only show that the criminal prosecution ended *without a conviction*." *Id.* at 1341 (emphasis added).

receive probation before judgment, and to *nolle prosse* the most serious charge of resisting arrest
. . . as well as [all] of the remaining charges." (TAC ¶ 54.) The prosecution's "agree[ment] to
allow" Plaintiff to be tried on a single charge does not plausibly plead her overall innocence of the
course of conduct she was charged with, particularly given that the dismissed charges are closely
related to Plaintiff's offense of conviction. *Cf. Etcheber v. F.B.I.*, Civ. No. JFA-13-0752, 2014
WL 1319145, at *10 (D.S.C. Mar. 28, 2014) (concluding that proceedings had not reached a
favorable termination where "felony indictments were dismissed as part of a plea agreement
[plaintiff] reached with the prosecution to plead guilty to lesser charges"), *aff'd*, 583 F. App'x 271
(4th Cir. 2014).[17] Thus, Plaintiff fails to plead that the criminal proceedings against her terminated
favorably. *See Candelero v. Cole*, 831 A.2d 495, 500 (Md. Ct. Spec. App. 2003) (concluding that
malicious prosecution claim failed as a matter of law where "State *nolle prossed* all of the charges
except disobeying the lawful order of a police officer").[18]

### iv.    *False Arrest/Imprisonment and Battery Claims Against Southwest*[19]

Indeed, the thrust of Plaintiff's argument appears to be that her PBJ for disorderly conduct
does not establish that the officers had probable cause to *arrest* her and therefore does not foreclose
her claims for false arrest, false imprisonment, and battery. (*See* ECF No. 59 at 8 (some emphasis

---

[17] Notably, Plaintiff describes the proceeding where she received her PBJ on the disorderly conduct charge as "plea proceedings." (*See* ECF No. 55 at 3 n.2.)

[18] Disobeying a lawful order is a form of disorderly conduct under Maryland law. *See* Md. Code Crim. Law § 10-201(c)(3).

[19] Some courts have concluded that state-law claims arising from a plaintiff's arrest and removal from a flight are also preempted by 49 U.S.C. § 41713(b), which preempts state laws "related to a price, route, or service of an air carrier[.]" *See Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 406 (S.D.N.Y. 2015). However, there is less consensus on this point than on other facets of the ADA's scope. *Cf. Rombom v. United Air Lines, Inc.*, 867 F. Supp. 214, 224 (S.D.N.Y. 1994) (concluding that preemption of claims stemming from arrest depends on fact-specific circumstances surrounding arrest). Because the Court concludes that there are several, independent reasons why these claims are futile, it does not resolve whether they are also independently futile as preempted by § 41713(b). *Cf. Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) (suggesting that state law tort claims are not preempted "to the extent [they] are based on conduct distinct from [airlines'] determination not to grant permission to board" but ultimately not resolving preemption scope because "[t]o the extent [plaintiff's] tort actions [were] not preempted . . . he failed to state a claim").

added) ("[Plaintiff's] disorderly conduct, *i.e.*, yelling, only commenced after the police officers unlawfully seizer her, which clearly does not and cannot establish that there was probable cause *for her forcible removal* from the plane *before* the officers touched her.").) To the extent this is Plaintiff's argument, it is implausible as a matter of law.

Under Maryland law, where a person "is the object of an *unlawful* police order, it is not usually a criminal violation for such person to verbally protest a police officer's insistence upon submission to that order." *Diehl v. State*, 451 A.2d 115, 122 (Md. 1982) (emphasis added). Verbal protests to an unlawful arrest are presumptively protected speech and may only support a charge of disorderly conduct where they amount to unprotected fighting words or incitement. *See id.* at 119 ("Diehl's conduct must have advocated imminent lawless action and been likely to incite a breach of the peace in order to be proscribable by the state."); *Briggs v. State*, 559 A.2d 1221, 1226 (Md. 1992).

Regarding her conduct during her removal from the flight[,] Plaintiff alleges that she merely pleaded with the officers and repeatedly told them that she was pregnant and would walk off the flight—none of which would be independently sufficient to sustain a charge of disorderly conduct initially predicated on an unlawful arrest. *Cf. Briggs*, 599 A.2d at 1226 (emphasis added) ("[T]he content of Briggs's language at this point was *insufficient* to give the officers probable cause, even though Briggs was saying 'fuck you, cops' and 'fuck you, motherfucking cops,' and continued shouting obscenities as the officers escorted him from the carnival."). As such, the only plausible inference that can be drawn from Plaintiff's pleadings is that her disorderly conduct charge was predicated on a failure to obey a *lawful* order. *See Harris v. State*, 237 Md. 299, 303 (1965) ("A failure to obey a reasonable and lawful request by a police officer fairly made to prevent a disturbance to the public peace constitutes disorderly conduct."). Thus her disorderly conduct

charge could only plausibly have stemmed from a lawful arrest (i.e., one effectuated with probable cause), and Plaintiff's argument that her PBJ for disorderly conduct "cannot establish that there was probable cause for her forcible removal from the plane *before* the officers touched her" is without merit. (ECF No. 59 at 8.) The conclusion that Plaintiff's PBJ establishes lawful authority to remove her from the flight from the beginning of her arrest thus forecloses her claims for false arrest, false imprisonment, and battery, except to the extent the battery claim alleges excessive force. *See State v. Roshchin*, 446 Md. 128, 138 (Md. 2016) (emphasis added) (internal quotation marks and citation omitted) ("For a plaintiff to succeed on a false arrest or false imprisonment claim, the plaintiff must establish that the defendant deprived the plaintiff of his or her liberty without consent and *without legal justification*."); *Ashton v. Brown*, 339 Md. 70, 119 n.24 (Md. 1995) ("[P]laintiffs' causes of action for assault and battery are . . . analytically dependent upon the cause of action for false imprisonment. . . . [I]f the arrests themselves were not tortious, neither was the physical force used to effectuate them [to the extent that] plaintiffs have not asserted a cause of action based on alleged excessive force in making lawful arrests.").

Against Southwest those claims are also barred, in their entirety, by the fact that Plaintiff has not plead that Southwest can be held liable for the actions of the police officers. Other than conclusory assertions, Plaintiff offers no allegations that Southwest was involved in her arrest beyond calling the police and requesting that she be removed from the flight. (*See* TAC ¶ 89 ("Southwest . . . requested that the Officer Defendants . . . forcibly remove Plaintiff from her flight, setting in motion events that resulted in the offensive touching of Plaintiff[.]").) These allegations do not establish a sufficient relationship between Southwest and the Officer Defendants such that Southwest may be held liable for their conduct under a theory of *respondeat superior*. *See Fletcher v. High's Dairy Prods. Div. of Cap. Milk Prods. Coop., Inc.*, 321 A.2d 821, 824 (1974) ("A private

person does not become liable for false arrest, however, when he provides information, even mistaken information, to lawful authorities, even though that information is the principal cause of another's [imprisonment].").[20]

> v.   **Section 1985(3) Claims[21]**

The entirely conclusory allegations regarding an extraordinary relationship between Southwest and the Officer Defendants likewise dooms Plaintiff's claims against Southwest under 42 U.S.C. § 1985(3). (*See* TAC ¶ 98 ("[B]y conspiring with Southwest personnel . . . to deprive Plaintiff of her civil rights the Officer Defendants [sic] actions were in violation of 42 U.S.C. § 1985(3) as well.").) Such claims fail when "the purported conspiracy is alleged in a conclusory manner, in the absence of concrete supporting facts." *Edokobi v. Mondo Intern., LLC*, Civ. No. ELH-18-3153, 2019 WL 3432431, at *12 (D. Md. July 29, 2019) (quoting *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995)). Specifically, a Plaintiff "must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy. . . . Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007)). The assertion of conspiracy here, a single line supported by no facts, plainly fails as a "bare assertion

---

[20] This conclusion accords with that of several other states to consider the question. *See, e.g., Austin v. Paramount Parks*, 195 F.3d 715, 731 (4th Cir. 1999) ("The Virginia Supreme Court has established that a private employer may not be held liable under a theory of *respondeat superior* for torts committed by a special police officer when he or she acts as a public officer, as opposed to an agent, servant, or employee of the employer."); *Belcher v. Wal-Mart Stores, Inc.*, 568 S.E.2d 19, 28 (W. Va. 2002) ("[T]he act of summoning police officers is insufficient to invoke liability upon the summoner for any independent action by the police officers."); *Corp. Prop. Invs. v. Milon*, 549 S.E.2d 157, 163 (Ga. 2001) ("[T]he on-duty peace officer, carrying out her official duty, is not the agent, servant, or employee of a private citizen making a complaint; therefore, her conduct cannot be imputed to such citizen.").
[21] To the extent Plaintiff intended to assert liability against Southwest under § 1983 on a theory of joint state action, this claim also fails. *See Parver v. Jet Blue Airline Corp.*, 649 F. App'x 539, 543 (9th Cir. 2016) (rejecting this theory of liability where airline defendant "sent an alert to the police and the flight crew pointed [defendant] out when the officers boarded the plane").

of conspiracy." *Id.* (citation omitted) ("[T]he allegations that '[defendants] entered into a conspiracy' . . . 'are threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,' and are therefore not sufficient to state a claim.").

### vi. Claims Against Maryland

Many of Plaintiff's claims against Maryland are preliminarily barred by the Eleventh Amendment because they do not fit within the limited waiver of sovereign immunity effectuated by the MTCA. *See* Md. Code State Gov't § 12-101, *et seq.* Generally, "the Eleventh Amendment bars federal courts from exercising jurisdiction over suits against nonconsenting states or state entities" absent a valid waiver or abrogation of sovereign immunity. *See Kadel v. N.C. St. Health Plan for Teachers and State Emps.*, 12 F.4th 422, 428–29 (4th Cir. 2021). Removal of a case to federal court can constitute a waiver of immunity but only to the extent that "the State has explicitly waived immunity from state-court proceedings" related to the same claims. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 617–18 (2002) (declining to address "the scope of waiver by removal in a situation where the State's underlying sovereign immunity from suit has not been waived or abrogated in state court"); *see also Stewart v. North Carolina*, 393 F.3d 484, 490 (4th Cir. 2005) ("North Carolina, having not already consented to suit in its own courts, did not waive sovereign immunity by voluntarily removing the action to federal court for resolution of the immunity question.").

The MTCA authorizes a limited waiver of the State's sovereign immunity for state common law and constitutional tort claims. *See Higginbotham v. Pub. Serv. Com'n of Md.*, 985 A.2d 1183, 1193 (Md. 2009) ("[T]he Maryland Tort Claims Act, if otherwise applicable, encompasses constitutional torts."). However, Maryland's immunity is not waived under the MTCA for, *inter alia*, "[a]ny tortious act or omission of State personnel that . . . [i]s made with

36

malice or gross negligence[.]" Md. Code. Cts. and Jud. Proc. § 5-522. Malice, as used in the statute, "has been defined as 'behavior characterized by evil or wrong motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *State v. Rovin*, 246 A.3d 1190, 1217 (Md. 2021) (quoting *Newell v. Runnels*, 967 A.2d 729, 763 (2009)). Further, even where Maryland has potentially waived its sovereign immunity, "a claimant may not institute an action under this subtitle unless . . . the claimant submits a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim." Md. Code State Gov't § 12-106(b)(1). Combined, these limitations foreclose Plaintiff's claims against Maryland.

First, while Plaintiff, for the first time, alleges she submitted a written claim to the Treasurer that satisfies the notice requirement, she avers that this claim was submitted on September 27, 2018, one year *and one day* after she was removed from the Southwest flight. (*See* TAC ¶¶ 5, 7.) This is insufficient for any injuries suffered during Plaintiff's removal from the flight because "[t]he timeliness of the § 12-106(b)(1) notice . . . is dependent upon the point at which claimant suffered personal or property damage injury." *Haupt v. State*, 667 A.2d 179, 186 (Md. 1995). Provision of timely notice "is mandatory, so that failure to provide the requisite notice bars any suit against the State." *Williams v. Md. Dept. of Hum. Res.*, 764 A.2d 351, 364 (Md. Ct. Spec. App. 2000); *Rainey v. Maryland*, Civ. No. CCB-04-3848, 2005 WL 2319681, at *2 (D. Md. Sep. 21, 2005) (dismissing based on failure to provide timely notice where claim was filed nine days late, explaining that "failure to give notice at all within the time period [ ] is considered an 'outright failure to comply'" with the MTCA's requirements). Accordingly, Plaintiff's claims which occurred on September 26, 2017—battery, false arrest, and their state constitutional

37

equivalents—are barred by sovereign immunity.[22] *See State v. Copes*, 927 A.2d 426, 437 (Md. Ct. Spec. App. 2007) ("[P]laintiff's causes of action for false arrest and false imprisonment arose on the day he was arrested, because all of the elements of those claims existed at that time; and hence the date of the arrest was the date of injury[.]").[23]

Second, to the extent Plaintiff's claims are timely, she pleads that each and every one of them is infused with the sort of malice that precludes liability on the part of Maryland. *See Rodriguez v. Cooper*, 182 A.3d 853, 869 (Md. 2018) ("[T]he waiver of sovereign immunity [under the MTCA] is not effective if the State personnel acted with malice or gross negligence[.]"). As to Count II, she alleges that the officers caused her to be maliciously prosecuted based on "information known to be false." (TAC ¶ 81); *Rovin*, 246 A.3d at 1217 (explaining that malice includes behavior "characterized by . . . fraud"). Count III goes further, explicitly alleging that her false arrest and imprisonment occurred "under circumstances demonstrating ill will, improper motive or evil purpose." (TAC ¶ 85.) While Count IV does not explicitly allege malice, the facts underlying it allege malicious conduct, including that the officers disbelieved Plaintiff's statements about her pregnancy (and thus failed to follow appropriate arrest procedures) based on overt racial animus. (*Id.* ¶¶ 30–34); *see also Shoemaker v. Smith*, 725 A.2d 549, 560 (Md. 1999) ("[M]alice . . . requires 'an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate[.]"). In Count V, Plaintiff underscores that "[t]he actions of the individual MDTA police officers were intentional and were carried out . . . under circumstances demonstrating ill will, improper motive or evil purpose." (TAC ¶ 93.) It seems difficult to

---

[22] While there are certain statutory exceptions applicable where "a claimant fails to submit a written claim in accordance [with the MTCA,]" Plaintiff has neither alleged nor argued that any of these exceptions applies to her untimely notice. *See* Md. Code State Gov't § 12-106(c)(1).
[23] Here, because Plaintiff was held overnight, it is not clear that her claim for false imprisonment is time-barred and, in previous filings, Maryland has not contested that notice of this claim was timely. (*See* ECF No. 16 at 16 n.5.)

reconcile Plaintiff's repeated insistence that the officers acted with malice with any conclusion other than that Maryland has not waived sovereign immunity for those claims.

Even to the extent that the Court discounts Plaintiff's conclusory allegations of malice and assumes jurisdiction over the claims for which she provided timely notice (false imprisonment and malicious prosecution), those claims would fail for the same substantive reasons that they are not plausible as to Southwest. *See supra* Parts IV.B.2.b.iii–iv.

### C. Summary

In sum, Plaintiff's proposed Third Amended Complaint is futile because Plaintiff's claims against each defendant fail for multiple, overlapping reasons. Plaintiff's filings make no more than a cursory attempt to overcome these various, independently sufficient grounds warranting Rule 12(b)(6) dismissal. This lack of genuine effort to defend the legal plausibility of her Complaint further confirms this Court's prior conclusions that Plaintiff's repeated amended pleadings have failed to cure previously identified defects and have instead been merely a superficial effort to avoid dismissal. *See Bioiberia Neb., Inc.* 2021 WL 242494, at *2.

To further recapitulate, the Court concludes that leave to file a Third Amended Complaint must be denied for at least three independent reasons: (1) Plaintiff's repeated amendments have been made in bad faith; (2) Plaintiff's repeated failure to cure defects in her pleadings has been prejudicial to Defendants; and (3) the Third Amended Complaint is futile. That each of these reasons provides robust grounds for denying amendment permits the Court to take a more conservative approach on other reasonable, but less clearly established, grounds such as Plaintiff's failure to satisfy Federal Rule of Procedure 60(b) and denying amendment based solely on her failure to cure pleading defects.

Stepping back from the instant Motion, the Court believes the following rulings are pertinent following the Court of Appeals' limited remand. First, this Court has granted Defendants' Motions to Dismiss the Second Amended Complaint largely on the same grounds that it has found the proposed Third Amended Complaint to be futile, though through the procedural lens required by the fact those Motions were unopposed. (*See* ECF No. 45); *see also Benton v. Bank of Am.*, Civ. No. PX-16-0613, 2017 WL 588468, at *2 (D. Md. Feb 14, 2017) (quoting *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004)) ("[W]hen a plaintiff fails to oppose a motion to dismiss, a district court is 'entitled, as authorized, to rule on the . . . motion and dismiss the suit on the uncontroverted bases asserted."). Second, it has denied Plaintiff relief from that dismissal under Federal Rule of Civil Procedure 60(b), relief that was sought based on Plaintiff's contention that the Court committed legal error in taking judicial notice of her PBJ and in assessing its effect on her claims. (*See* ECF No. 56.) Third and finally, this Court has denied Plaintiff leave to file a Third Amended Complaint for the reasons stated in this Memorandum.

At bottom, while Plaintiff has repeatedly alleged that she suffered gratuitous violence and animus when she was removed from a Southwest flight on September 26, 2017, she has simply not explained why those allegations, taken as true, plausibly support the particular legal claims she asserts, or why those claims can be asserted against the particular defendants she has attempted to hold responsible. In our adversarial system of civil justice, this reticence is not merely frustrating: it is fatal to her Complaint(s) in light of the significant authorities marshaled by Defendants that persuasively explain why her claims are implausible, untimely, precluded by immunity—or a combination of all three. Absent additional guidance from the Court of Appeals, this Court concludes that Defendants are entitled to the benefit of their repeated efforts to dismiss Plaintiff's serious allegations. Leave to amend will be denied.

40

## V.    *Conclusion*

For the foregoing reasons, a separate Order shall issue denying Plaintiff's Motion for Leave

to File a Third Amended Complaint (ECF Nos. 55, 59).


DATED this ___8___ day of June, 2022.

BY THE COURT:

James K. Bredar
Chief Judge

41